OPINION OF THE COURT
 

 ATKINS, Senior District Judge.
 

 Richard Fitzpatrick, Amos Salmon, John Surratt and Raymond Washington appeal to this court from final judgments of conviction and sentence entered by the United States District Court for the Western District of Pennsylvania following a jury trial in which they were found guilty of conspiracy and substantive crimes relating to possession and distribution of cocaine. We address the following questions raised by their appeals: (1) whether the evidence against Fitzpatrick, Salmon and Surratt was sufficient to prove their convictions; (2) whether a variance between the indictment and proof as to the number of conspiracies existed to the prejudice of any defendant; (3) whether the district court erred in refusing to suppress a weapon found in Washington’s car trunk during a warrantless search following the vehicle’s seizure under Pennsylvania forfeiture law; (4) whether the court’s refusal to give the entrapment instructions requested by Washington was an abuse of discretion; (5) whether the court’s refusal to permit Washington to examine Surratt as to whether the confidential informant used cocaine while arranging sales was an abuse of discretion; and (6) whether the sentences imposed on Washington, Salmon and Surratt are clearly erroneous or otherwise contrary to law. For the reasons that follow, we will REVERSE Fitzpatrick’s convictions and vacate his sentences; AFFIRM the convictions and sentences of Salmon and Surratt; and REVERSE Washington’s conviction and vacate his sentence for felony weapon possession, but AFFIRM his other convictions and sentences imposed under the career offender Guidelines.
 

 A. BACKGROUND
 

 Because the evidence is crucial to several issues, we review the record in significant detail. In the Spring of 1989, a woman named Sandra Mithani sought to avoid prosecution for writing bad checks by cooperating as a confidential informant with the City of Greensburg Police Department. After telling Detective James Williams of the Greensburg Police Department that she had purchased small amounts of cocaine from Washington, at William’s behest Mi-thani contacted Washington and told him she had an out-of-town cousin who wanted to purchase cocaine. Mithani asked Washington if her cousin could buy an ounce of cocaine from Washington, who told her it would be no problem. Appellants’ Appen
 
 *1111
 
 dix (“App.”) at 151-61. Mithani arranged a meeting between Washington and Detective Terrence Kuhns of the Westmoreland County District Attorney’s office, who posed as Mithani’s cousin. On the day the meeting was to occur, however, Mithani did not appear. Later that day Washington visited Mithani and insisted she help him get rid of the cocaine he possessed. Mitha-ni contacted Detective Williams, who instructed her to set up a deal for the next day.
 
 Id.
 
 at 163-66.
 

 Washington arrived at Mithani’s residence the following day, August 10, 1989, in the company of Surratt, known as “Yogi” to Mithani. Detective Kuhns arrived and got in the back seat of the car, identifying himself as Mithani’s cousin. Kuhns examined the package containing cocaine and told Washington it looked “light.” Washington told Kuhns to contact Mithani if the package contained less than one ounce of cocaine.
 
 Id.
 
 at 222-26. Kuhns then told Washington he was looking for a new source of cocaine. Surratt commented that the cocaine was of good quality and that Kuhns couldn’t buy cocaine of comparable quality in the Greens-burg area. Washington then handed the cocaine to Surratt, who handed it to Kuhns. Detective Kuhns next handed $1,500 to Surratt, who handed the money to Washington. After Washington told Kuhns he could obtain more cocaine on a day’s notice, Washington and Kuhns discussed the purchase of four additional ounces. Washington stated that the price would vary depending on the source. Before leaving, Kuhns told Washington and Surratt they should treat him well because he would make future transactions with them. Sur-ratt responded by stating, “we’re like Allstate; you’re in good hands with us.”
 
 Id.
 
 at 227-30.
 

 The following day, August 11, Kuhns telephoned Washington that he wanted to buy eight ounces of cocaine toward the end of the week. Government Tape Exhibit (“Tape”) 22. Five days later, on August 16, 1989, Mithani telephoned Washington that her “cousin” wanted Washington to call. A few minutes later, an individual identifying himself as Ray’s partner “Yogi” called Kuhns and told him Washington wanted to know what he wanted. Kuhns said he wanted eight ounces for $1,000 each. Yogi told Kuhns that Washington would call Kuhns back. A short time later, Washington called and told Kuhns the price was $1,200 per ounce. Kuhns asked whether he could buy sixteen ounces for $1,000 each. Washington answered that he and the other people were afraid of dealing that much cocaine and that he was afraid of being arrested. Kuhns indicated that the source could be present at the deal. Tape 23.
 

 Three days later, on August 19, Kuhns called Washington, who called him right back. Washington told Kuhns that “they” wanted to do only five the first time but would do the rest after they saw Kuhns was “allright.” Kuhns called Washington back and told him that they would do the transaction in two phases, the first phase involving the transfer of the five ounces of cocaine, to be followed by the remainder. Washington said he would contact Kuhns after speaking with his source. Tape 24. On August 22, 1989, Kuhns called Washington, who called Kuhns back, telling him that only one of three potential sources was willing to do the deal. Kuhns told Washington to have his source call Kuhns; shortly thereafter, an individual identifying himself as “Jerome” called Kuhns. He told Kuhns that there was a problem acquiring the cocaine, that he didn’t want to deal with Kuhns directly, and that he didn’t want to do anything right then because he was having trouble with the police. He also told Kuhns that he would call him as soon as “it” arrived, sometime that week. Three days later, Washington returned Kuhns’ call and told him he hadn’t spoken with his source in a while; Kuhns told Washington to have his source call him back. Tape 25.
 

 On September 5, Washington returned another of Kuhns’ calls and indicated that the source was ready to do business that night, but Kuhns told Washington he couldn’t do it until the next day, September 6, 1989. Tape 26. The next day Washington returned yet another call from Kuhns
 
 *1112
 
 and told him the transaction would take place at 8:00 p.m. in the parking lot of a McDonald’s restaurant next to a shopping center on Route 30. Washington said everyone would be driving to the location separately.
 
 Id.
 
 Later that evening, Kuhns went to the designated parking lot. Washington pulled up in a white Cadillac, exited his vehicle, and walked over to Kuhns. Washington told Kuhns that he was going to look for the source, who may have gone to the wrong place, and that the source would be driving a red Cadillac with multiple antennae. App. at 245-46. As Washington left the parking lot, he passed a blue Oldsmobile pulling into the parking lot. As the vehicles passed, both vehicles’ horns sounded. The blue Oldsmobile then exited the parking lot and followed Washington down Route 30. Both vehicles eventually returned to the parking lot.
 
 Id.
 
 at 357-58.
 

 Upon returning, Washington exited his vehicle and met with a man subsequently identified as Salmon. As the two spoke, a man who turned out to be Fitzpatrick exited the blue Oldsmobile and opened its trunk.
 
 Id.
 
 at 360. Salmon eventually parted Washington’s company and returned to the back of the Oldsmobile, where Fitzpatrick stood beside the open trunk. The surveillance officers were unable to see what, if anything, occurred there.
 
 Id.
 
 at 360. Meanwhile, Washington approached Kuhns’ car, told Kuhns “that’s him” and asked Kuhns if he had the money.
 
 Id.
 
 at 248-49. When Kuhns said he did, Washington walked across the parking lot and met with Salmon again.
 
 Id.
 
 at 251, 361. As Washington conversed with Salmon at a distance of approximately forty yards from Fitzpatrick, Fitzpatrick, who had already closed the trunk, stood by the hood of the Oldsmobile he had opened. Salmon again left Washington’s company and returned to where Fitzpatrick stood near the Oldsmobile, its hood now closed. After the two conversed, Fitzpatrick returned to the Oldsmobile, entered the driver’s side of the vehicle, and drove past Salmon to a gas station on Route 30. Salmon walked through a gravel lot, crossed Route 30, and walked along the highway.
 
 Id.
 
 at 362-64. Meanwhile, as Washington approached Kuhns’ vehicle, Kuhns noticed a bulge in the area of Washington’s waist. Washington entered Kuhns’ vehicle, took the cocaine from his waist area, and gave it to Kuhns.
 

 After Kuhns signaled the backup units, Washington was placed under arrest.
 
 Id.
 
 at 251-55. As two detectives approached Salmon along Route 30, he crossed back over the highway and began running toward the blue Oldsmobile parked at the gas station, where Fitzpatrick was pumping gas into the vehicle. Salmon entered and started the car, but complied with the detectives’ ordering him out of the car and placing him under arrest. A pair of binoculars and a walkie-talkie were observed on the front seat of the Oldsmobile at this time.
 
 Id.
 
 at 365-68. Meanwhile, another detective approached Fitzpatrick and identified himself as a police officer. As the detective approached, Fitzpatrick apparently edged backwards,
 
 id.
 
 at 368, but eventually was stopped and placed under arrest. A second walkie-talkie was found on Fitzpatrick.
 
 Id.
 
 at 456-57. Fitzpatrick made a post-arrest statement to the effect that earlier in the day Salmon had come by to ask whether he could use Fitzpatrick’s vehicle.
 
 Id.
 
 at 372. Fitzpatrick stated that Salmon, in possession of the binoculars and walkie-talkies, asked Fitzpatrick to ride with him to the shopping center where Salmon was supposed to meet with someone, “to watch Salmon’s back.”
 
 Id.
 
 at 372-73.
 

 A grand jury indicted Fitzpatrick, Salmon, Surratt and Washington in a five-count indictment. Count One charged all four defendants with conspiring from August 9, 1989, to on or about September 6, 1989, to possess with intent to distribute less than 500 grams of cocaine in violation of 21 U.S.C. § 846. Count Two charged that Washington and Surratt possessed with intent to distribute less than 500 grams of cocaine on August 10, 1989, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Count Three charged Washington, Salmon and Fitzpatrick with possessing with intent to distribute less than 500 grams on or about September 6, 1989, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Count
 
 *1113
 
 Four charged that Washington intentionally and unlawfully carried and used a firearm during and in relation to the drug trafficking crime alleged in Count One, in violation of 18 U.S.C. § 924(c)(1). Count Five charged Washington with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 924(c)(1).
 

 Having pleaded not guilty, all four defendants were tried before a jury, which on March 21, 1990 returned the following verdicts: all four defendants guilty as to Count One, the conspiracy charge; Washington guilty as to Count Two, the August 10, 1989 possession charge; Washington, Salmon and Fitzpatrick guilty as to Count Three, the September 6, 1989 possession charge; and Washington guilty as to Count Five, the felony-weapon-possession charge. Count Four, the use-of-a-firearm charge against Washington, was dismissed by the court before trial; Count Two, the August 10, 1989 possession charge, was dismissed as to Surratt on the government’s motion after the jury failed to reach a verdict. The defendants received the following sentences. Washington was sentenced as a career offender to terms of 210 months on Counts One, Two and Three, and a term of 120 months on Count Five, with all terms running concurrently; at least six years probation; and a $200 total special assessment. Salmon was sentenced to sentences of fifty-one (51) months on both Counts One and Three, with such terms running concurrently; at least three years probation; and a $100 total special assessment. Fitzpatrick was sentenced to a term of twenty-one (21) months on Counts One and Three, to be served concurrently; at least three years probation; and a $100 total special assessment. John Surratt was sentenced to thirty-three (33) months in prison on Count One; three years probation; and a $50 special assessment. All defendants filed timely notices of appeal and presently serve their sentences.
 

 B. DISCUSSION
 

 1. Sufficiency of the Evidence
 

 “[V]iew[ing] the evidence and the inferences logically deducible therefrom in the light most favorable to the government,”
 
 United States v. McNeill,
 
 887 F.2d 448, 449-50 (3d Cir.1989),
 
 cert. denied,
 
 493 U.S. 1087, 110 S.Ct. 1152, 107 L.Ed.2d 1055 (1990), we first consider whether substantial evidence, direct or circumstantial,
 
 United States v. Kapp,
 
 781 F.2d 1008, 1010 (3d Cir.),
 
 cert. denied, 475
 
 U.S. 1024, 106 S.Ct. 1220, 89 L.Ed.2d 330 (1986), supports the convictions of Fitzpatrick, Salmon and Sur-ratt. Stated differently, we must determine whether a reasonable jury believing the government’s evidence could find beyond a reasonable doubt that the government proved all the elements of the offenses.
 
 United States v. Samuels,
 
 741 F.2d 570, 573 (3d Cir.1984). A conspiracy conviction requires that one agreed to commit an unlawful act and intended to commit the underlying offense,
 
 United States v. American Investors of Pittsburgh, Inc.,
 
 879 F.2d 1087, 1100 (3d Cir.),
 
 cert. denied,
 
 493 U.S. 955, 110 S.Ct. 368, 107 L.Ed.2d 354 (1989); intent to commit the underlying offense requires that one had “knowledge of
 
 the
 
 illegal objective contemplated by the conspiracy,”
 
 United States v. Wexler,
 
 838 F.2d 88, 91 (3d Cir.1988) (emphasis added). A conviction for possession with intent to distribute a controlled substance requires that one knowingly and intentionally possessed the substance with the intent to distribute it.
 
 United States v. Martorano,
 
 709 F.2d 863, 866 (3d Cir.),
 
 cert. denied,
 
 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983). An aiding-and-abetting conviction requires that another committed the substantive offense and that the one charged with aiding and abetting knew of the substantive-offense commission and acted with the intent to facilitate it,
 
 United States v. Dixon,
 
 658 F.2d 181, 189 n. 17 (3d Cir.1981); acting with the intent to facilitate the substantive offense requires that one acted with the “intent to help those involved with a
 
 certain
 
 crime,”
 
 Wexler,
 
 838 F.2d at 92 (emphasis added).
 

 (a) Fitzpatrick
 

 Fitzpatrick challenges his convictions for conspiring to possess with the intent to distribute cocaine and for aiding
 
 *1114
 
 and abetting another’s possession with the intent to distribute marijuana; he argues that the record contains no evidence he had either knowledge of the conspiracy’s objective or intent to help his coconspirators with a certain crime, in both instances the possession with intent to distribute cocaine. He offers the case of
 
 United States v. Wexler, supra,
 
 to support his contentions. There, Wexler challenged his conspiracy and aiding-and-abetting convictions on the ground that no evidence supported a finding that, in his role as a lookout, he ever knew that hashish or any other controlled substance was involved in the activities giving rise to his convictions. The evidence showed that on the night .of a controlled delivery of 750 pounds of hashish stored in crates of engine parts, Wexler had done the following: driven by the surveillance area at five miles per hour; reversed his course upon making eye contact with the agents; signaled to the driver of the truck containing the hashish; and talked to one of the drivers of the truck on two separate occasions. The evidence also showed that upon his arrest, Wexler possessed a portable CB radio he had purchased under a false name the previous day.
 
 Id.
 
 at 89-90.
 

 This court determined that although this evidence showed that Wexler had agreed to commit an unlawful act and that a substantive offense had occurred, the evidence was insufficient to allow a reasonable jury to conclude that Wexler knew a controlled substance was hidden among the engine parts in the truck. Regarding the conspiracy conviction, the court reasoned that the circumstances supported an inference that Wexler knew “that some form of contraband was involved in the elaborate secretive arrangements for transport in which he participated.”
 
 Id.
 
 at 92. However, the court concluded that “these permissible inferences do not support a holding that the government met its burden to prove beyond a reasonable doubt that Wexler knew this was a conspiracy to transport hashish.... [T]he evidence is just as consistent, for example, with a conspiracy to transport stolen goods, an entirely different crime.”
 
 Id.
 
 In addition, the court concluded that “a reasonable jury also could not have had sufficient evidence from which to find that Wexler purposefully aided and abetted the possession and/or distribution of hashish.”
 
 Id.
 
 This conclusion was based on the court’s determination that the evidence was insufficient to “prove that Wexler had knowledge of the hashish, had knowledge that [the other defendant] intended to distribute or possess hashish, or purposefully intended to aid others in committing the crime alleged.”
 
 Id.
 

 The circumstances implicating Wexler bear a strong resemblance to some of the circumstances implicating Fitzpatrick: both performed surveillance, spoke to co-conspirators, and possessed surveillance equipment upon their arrests. However, the government distinguishes
 
 Wexler
 
 on the basis of evidence of Fitzpatrick’s movements in the parking lot which, the government contends, supports an inference that Fitzpatrick, unlike Wexler, was aware of the nature of the transaction: when Salmon initially left the Oldsmobile to meet with Washington, Fitzpatrick exited the Oldsmobile and opened the trunk; thereafter, Salmon returned to the trunk area before walking back to meet with Washington again; after meeting with Salmon, Washington returned to Kuhns’ ear with the cocaine. While we recognize that a crime’s elements may be proven entirely by circumstantial evidence,
 
 see Kapp,
 
 781 F.2d at 1010, we disagree with the government’s contention that these movements, combined with the consistency and wrapping of the cocaine in a brown paper bag, could allow a reasonable jury to find beyond a reasonable doubt that Fitzpatrick knew that cocaine or another controlled substance was the object of the transaction. Although “[¡Inferences from established facts are accepted methods of proof when no direct evidence is available,”
 
 McNeill,
 
 887 F.2d at 450, there must be “a logical and convincing connection between the facts
 
 established
 
 and the conclusion inferred,”
 
 id.
 
 (emphasis added);
 
 United States v. Bycer,
 
 593 F.2d 549, 550 (3d Cir.1979). The government’s sequence-of-events argument is premised on the notion that the cocaine was located in the trunk of Fitzpatrick’s
 
 *1115
 
 Oldsmobile. This notion, however, is unsupported by any established fact. Even assuming,
 
 arguendo,
 
 that the cocaine was in the trunk, the record contains no evidence that Fitzpatrick knew that the bag contained a controlled substance such as cocaine as opposed to anything else.
 

 We thus conclude that the record contains no evidence, direct or circumstantial, from which a reasonable jury could find beyond a reasonable doubt that Fitzpatrick had either the specific knowledge required for his conspiracy conviction or the specific intent required for his aiding and abetting conviction.
 
 Cf. United States v. Leon,
 
 739 F.2d 885, 892-93 (3d Cir.1984) (finding sufficient to uphold determination that defendant knew objective of conspiracy evidence that defendant was found lying face down just yards away from spot where
 
 tons
 
 of marijuana had been recently unloaded and found by agents);
 
 United States v. Cooper,
 
 567 F.2d 252, 254-55 (3d Cir.1977) (finding evidence of defendant’s traveling cross-country with coconspirator in truck with rear compartment containing marijuana and sharing motel room with coconspirator insufficient to uphold conclusion that defendant knew of marijuana).
 
 [1]
 
 Accordingly, Fitzpatrick’s convictions will be reversed and his sentences vacated.
 
 [2]
 

 (b) Salmon
 

 Viewing the record in the light most favorable to the government, we have little difficulty finding sufficient evidence to support Salmon’s conspiracy and substantive convictions. The relevant trial testimony showed that Salmon recruited Fitzpatrick to perform surveillance at the parking lot; that Washington told Kuhns the “source” would arrive in a red Cadillac with multiple antennae; that although Salmon and Fitz-Patrick arrived in Fitzpatrick’s blue Oldsmobile, Salmon owned a maroon Cadillac with multiple antennae, which he had left near Fitzpatrick’s house; that when both cars returned to the lot, Washington left his vehicle and talked with Salmon; that when Washington rejoined Kuhns’ company, Washington said, “that’s him” and asked the officer whether he had the money; and that after the officer gave Washington the money, Washington again met with Salmon and returned with a “bulge in his pants,” from which he retrieved the cocaine that he gave to Kuhns. A reasonable jury believing this circumstantial evidence “and the inferences logically deducible therefrom,”
 
 McNeill,
 
 887 F.2d at 449-50, could find beyond a reasonable doubt that Salmon agreed to commit an unlawful act and knowingly and intentionally possessed cocaine with the intent to distribute it. Thus, Salmon’s sufficiency challenges fail.
 

 (c) Surratt
 

 Finally, Surratt challenges the sufficiency of evidence supporting his sole conviction, of conspiring from August 9, 1989 to September 6, 1989 to possess cocaine with the intent to distribute it. Regarding the August 10, 1989 transaction, Kuhns testified that Surratt accompanied Washington to meet him and that Surratt handed the cocaine from Washington to Kuhns and the money from Kuhns to Washington. Kuhns also testified that Surratt told him the cocaine was as good as any he could get in the area and, in response to Kuhns’ statement that they should treat him well because he would be back, Surratt added, “we’re like Allstate; you’re in good hands with us.” The only additional evidence was Kuhns’ testimony about and a tape recording of a phone call he received from some
 
 *1116
 
 one identifying himself as “Yogi,” who said he was Washington’s partner and that they would be ready to do the transaction by the weekend. Surratt argues that his presence at the August 10 transaction was merely consistent with his duties as a handyman for Washington; indeed, Count Two, charging Surratt with possession with intent to distribute cocaine on August 10, was dismissed as to him after the jury was unable to reach a verdict. Surratt further argues that the above-described phonecall was barely audible on tape because of line static and was tied to him only by Kuhns’ speculation that the voice on the phone sounded like Surratt’s. A reasonable jury believing this circumstantial evidence and the “inferences logically deducible therefrom in the light most favorable to the government,”
 
 id.,
 
 could find beyond a reasonable doubt that Surratt agreed to commit an unlawful act and intended to possess with the intent to distribute cocaine, as charged in Count One.
 
 See United States v. Donsky,
 
 825 F.2d 746, 754 (3d Cir.1987) (noting that a conspirator need not know identities of all coconspirators or all details of the conspiracy). Thus, Surratt’s sufficiency challenge fails.
 

 2. Conspiracy Variance
 

 We next consider the variance claims advanced by Salmon, Surratt and Washington. Under the doctrine announced in
 
 Kotteakos v. United States,
 
 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), a conviction must be vacated where a variance between the indictment and proof at trial exists to the prejudice of a defendant’s substantial rights.
 
 United States v. Kelly,
 
 892 F.2d 255, 258 (3d Cir.1989). Where a single conspiracy has been alleged, a variance of proof occurs if the evidence shows merely multiple conspiracies.
 
 Id.
 
 The variance doctrine is designed to protect a defendant’s right “ ‘not to be tried
 
 en masse
 
 for the conglomeration of distinct and separate offenses committed by others.’ ”
 
 Id.
 
 (quoting
 
 Kotteakos,
 
 328 U.S. at 775, 66 S.Ct. at 1253). The doctrine recognizes that in some situations a “jury might have been unable to separate offenders and offenses and easily could have transferred the guilt from one alleged co-schemer to another.”
 
 United States v. Camiel,
 
 689 F.2d 31, 38 (3d Cir.1982). We must review the record evidence in the light most favorable to the government to determine whether a reasonable jury could find the existence of a single conspiracy.
 
 United States v. Kelly,
 
 892 F.2d 255, 258 (3d Cir.1989),
 
 cert. denied,
 
 — U.S. -, 110 S.Ct. 3243, 111 L.Ed.2d 754 (1990);
 
 United States v. Smith,
 
 789 F.2d 196, 200 (3d Cir.1986),
 
 cert. denied,
 
 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 832 (1987). This court previously set out a three-step inquiry to aid such a determination:
 

 First, we examine whether there was a common goal among the conspirators. Second, we look at the nature of the scheme to determine whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators. Third, we examine the extent to which the participants overlap in the various dealings.
 

 Kelly,
 
 892 F.2d at 259 (quotations and citations omitted).
 

 In
 
 Kelly,
 
 Kelly appealed his conviction for conspiracy to possess and manufacture methamphetamine. The single conspiracy count in the indictment charged that over a four-year period, three groups comprised of twenty-eight people conspired to import, manufacture and distribute methamphetamine into the United States. The evidence showed that for approximately the initial one to two years, the first group imported the necessary chemicals while the second group manufactured and distributed the methanmpetamine; that during the second year, the third organization began exacting a “street tax” on imported chemicals from the first group; and that by the beginning of the third year, the entire operation had come under the control of the third organization, which retained control for the temporal balance of the conspiracy charged.
 
 Id.
 
 at 256-58. At trial the government theorized that a classic chain conspiracy — where a product is transported, then refined, and ultimately distributed to the ultimate consumer — was created.
 
 *1117
 
 Kelly argued that his switching from one organization to another broke the conspiracy chain, thus creating two separate conspiracies, and that the government’s use of evidence of crimes committed by members of the other organization unfairly prejudiced his defense.
 
 Id.
 
 at 258.
 

 This court determined that all three steps of the variance inquiry supported the jury’s finding of a single conspiracy. First, a common goal existed among all the conspirators because “[t]he evidence overwhelmingly established] that this was an enterprise in which everyone made a gluttonous profit.”
 
 Id.
 
 at 259. Second, the agreement between the three organizations contemplated bringing to pass a continuous result that would not continue without the continuous cooperation of the conspirators, as the success or failure of the operation depended upon one organization’s steady procurement of supplies from Europe.
 
 Id.
 
 at 259-GO. Finally, the continuous participation of one conspirator — the defendant Kelly — provided sufficient overlap, as “the government need not prove that each defendant knew all the details, goals, or other participants in order to find a single conspiracy.”
 
 Id.
 
 at 260 (quotation omitted).
 

 Count One of the indictment in the present ease charged the defendants with conspiracy to possess with intent to distribute cocaine over an approximately one-month period: August 9, 1989 to on or about September 6, 1989. Salmon, Surratt and Washington contend that while the indictment charged one continuous conspiracy, the prosecution proved two — one regarding the August 10, 1989 transaction and the other the September 6, 1989 transaction; they also contend that this variance unfairly prejudiced their defense because it led to jury confusion or “spillover” which rendered the jury “unable to separate offenders and offenses” and “transferred the guilt from one alleged co-schemer to another.”
 
 Camiel,
 
 689 F.2d at 38. The government contends that no variance existed, but that any variance which may have existed did not substantially prejudice the defense.
 

 We conclude that a reasonable jury believing all of the government’s evidence in the present case could find the existence of a single conspiracy beyond a reasonable doubt. Following the three-step
 
 Kelly
 
 inquiry, we first determine that the record supports a finding of “a common goal among the conspirators,”
 
 Kelly,
 
 892 F.2d at 259, i.e., the sale of cocaine for profit or another benefit. Such a finding is supported by the following evidence: testimony that Washington contacted Kuhns on many occasions and eventually negotiated a cocaine purchase price that was “normal,” app. at 237, presumably allowing Washington to receive a benefit, either in cash or drugs; Surratt’s statement to Kuhns immediately following the August 10, 1989 transaction that “we’re like [profit-making] Allstate, you’re in good hands with us”; and evidence that Salmon supplied the cocaine for the September 6, 1989 transaction, presumably to make a profit. Viewing this evidence in the light most favorable to the government, we find sufficient unity of purpose among Washington, Surratt and Salmon.
 

 The second step of our inquiry — whether the nature of the scheme indicates that “the agreement contemplated bringing to pass a continuous result that [would] not continue without the continuous cooperation of the conspirators,”
 
 Kelly,
 
 892 F.2d at 259 — also supports a single-conspiracy finding. Even if the continued involvement of only Washington was essential, the record evidence supports a finding that the activities of others were “ ‘necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture.’ ”
 
 Id.
 
 (quoting
 
 United States v. DeVarona,
 
 872 F.2d 114, 119 (5th Cir.1989)). The record contains evidence that Surratt helped exchange money for drugs during the August 10, 1989 transaction and relayed information regarding a contemplated transaction between Kuhns and Washington on August 16, 1989. Viewed in the light most favorable to the government, the fact that Washington called Kuhns a short while later with a price suggests that Surratt did indeed pass Kuhns’ message on to Washington. Likewise, although Salmon’s involvement as a cocaine supplier apparently was not crucial
 
 *1118
 
 to the continuing operations because Washington had several sources, Salmon’s supplying the cocaine nevertheless was “advantageous to the ... overall success of the venture.”
 
 Id.
 
 at 259. Accordingly, we find that the nature of the scheme supports a finding of a single conspiracy.
 

 Finally, we consider the overlap among the participants in the two transactions. Although Salmon was involved in only the September 6 transaction, at least one member — Washington—indisputably was involved in both. In addition, viewed in the light most favorable to the government, the trial evidence indicates that Surratt acted as a messenger between Kuhns and Washington with respect to the September 6, 1989 transaction. We find the overlap among participants sufficient.
 
 Cf. id.
 
 at 260 (finding sufficient overlap and single conspiracy where one conspirator was involved for duration);
 
 Camiel,
 
 689 F.2d at 36 (finding insufficient overlap and separate conspiracies where two antagonistic factions of alleged conspiracy would not work together). Viewing the evidence in the light most favorable to the government, we conclude that a reasonable jury could have found the existence of the single conspiracy charged in the indictment. Accordingly, the conspiracy-variance challenges fail.
 

 3. Suppression of Weapon
 

 We next consider whether the district court erred by denying Washington’s motion to suppress a weapon found in a gym bag in the trunk of his vehicle during the course of at least two different searches. At the scene of the arrests on September 6, 1989, a detective apparently opened the trunk of Washington’s vehicle and observed the weapon in the open gym bag; however, the detective’s identity never was ascertained. App. at 128. A second search occurred at the parking garage of the Westmoreland County Courthouse, where the vehicle was taken by Detective Paden pursuant to orders of Detective Eckels that the car be seized for forfeiture based on his determination that the ear had been used to “facilitate” a narcotics transaction. Once at the courthouse parking garage, Detective Paden searched the vehicle “to make sure there were no weapons or anything else that could endanger the safety of anybody in the courthouse.”
 
 Id.
 
 at 130-32. Upon discovering the weapon in the bag in the trunk, Detective Paden notified Detective Eckels, who took possession of the weapon.
 
 Id.
 
 at 131. A complete search of the vehicle was conducted the next day.
 
 Id.
 
 at 56-57.
 

 Washington moved to suppress the weapon prior to trial on the ground that the searches of his vehicle were unconstitutional. The government conceded that the initial search at the arrest scene could not be supported by the automobile exception because the identity of the detective who initially searched the car was unknown, making it impossible to determine whether that officer had a belief supported by probable cause. Relying on the independent source doctrine, the government argued instead that the gun would have been discovered during the searches at the garage. Washington responded that the courthouse searches were unconstitutional because they were not conducted according to any standardized criteria. The district court denied Washington's motion to suppress, holding that the question of standardized criteria was irrelevant because the vehicle was not merely impounded, but seized for forfeiture. The court held that once the vehicle was lawfully in the government’s possession for forfeiture purposes, the detectives were able to perform any type of search and use any evidence found.
 
 [3]
 

 
 *1119
 
 (a) The Seizure
 

 We first determine whether the warrantless seizure of Washington’s vehicle following his arrest was lawful, which requires us to make two determinations: whether the warrantless seizure of the car was authorized by statute; and if so, whether the seizure was consistent with fourth amendment standards.
 
 See United States v. Bush,
 
 647 F.2d 357, 366 (3d Cir.1981);
 
 United States v. One 1977 Lincoln Mark V Coupe,
 
 643 F.2d 154, 157-58 (3d Cir.),
 
 cert. denied,
 
 454 U.S. 818, 102 S.Ct. 97, 70 L.Ed.2d 88 (1981); U.S. Const, amend. IV (prohibiting “unreasonable searches and seizures”). Washington’s vehicle was seized pursuant to Title 42, Section 6801, Pennsylvania Statutes, which subjects to forfeiture any vehicle used or intended to be used to “facilitate” the sale or possession of controlled substances. 42 Pa. Const. Stat.Ann. § 6801(A)(1), (4) (Purdon Supp.1990). The statute further provides that “[sjeizure without process may be made if: (1) the seizure is incident to an arrest ... [or] (4) there is probable cause to believe that the property has been used or is intended to be used in violation of The Controlled Substance, Drug, Device and Cosmetic Act.”
 
 [4]
 

 Id.
 
 § 6801(B)(1), (4). This court previously has held under the analogous federal forfeiture statute that “facilitation” occurs where “there was a reasonable ground for belief that the use of the automobile made the [prohibited transaction] less difficult and allowed it to remain more or less free from obstruction or hinderance.”
 
 One 1977 Lincoln Mark V Coupe,
 
 643 F.2d at 157 (construing 21 U.S.C. § 881(b)) (quotation omitted). Because the arresting Westmoreland County detectives had probable cause to believe that Washington’s use of his vehicle made the September 6, 1989 cocaine transaction less difficult, their warrantless seizure of the vehicle was authorized by Pennsylvania statutory law.
 

 We also conclude that application of the statute in the present case so as to allow the warrantless seizure of the vehicle was consistent with fourth amendment standards. This court previously has held that a warrantless seizure supported by probable cause does not offend the fourth amendment.
 
 One 1977 Lincoln Mark V Coupe,
 
 643 F.2d at 158 (citing
 
 United States v. Troiano,
 
 365 F.2d 416, 418-19 (3d Cir.),
 
 cert. denied,
 
 385 U.S. 958, 87 S.Ct. 396, 17 L.Ed.2d 303 (1966)). This court subsequently reaffirmed that position, holding that “law enforcement officers may seize a vehicle without a warrant if they have probable cause to believe that the vehicle is subject to forfeiture.”
 
 Bush,
 
 647 F.2d at 369. In the present case, the Westmoreland County detective who ordered Washington’s vehicle seized had probable cause to believe that Washington’s vehicle was subject to forfeiture under Pennsylvania’s forfeiture statute. Accordingly, the vehicle’s warrantless seizure was reasonable under the fourth amendment.
 

 (b) The Search
 

 Having confirmed the statutory and constitutional lawfulness of the seizure, we must determine whether either of the war-rantless searches of the vehicle at the courthouse was reasonable under the fourth amendment.
 
 See Bush,
 
 647 F.2d at 370; U.S. Const, amend. IV (prohibiting
 
 *1120
 
 “unreasonable searches and seizures”). “It remains a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are
 
 per se
 
 unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.”
 
 California v. Acevedo,
 
 — U.S. -, -, 111 S.Ct. 1982, 1989-93, 114 L.Ed.2d 619 (1991) (quotations omitted). Such exceptions are based on the Supreme Court’s determination that a particular search is reasonable, that is, that the government’s legitimate interests in the search outweigh the individual’s legitimate expectation of privacy in the object of the search.
 
 See Colorado v. Bertine,
 
 479 U.S. 367, 372, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987);
 
 United States v. Ross,
 
 456 U.S. 798, 823-25, 102 S.Ct. 2157, 2172-73, 72 L.Ed.2d 572 (1982). We consider in turn three exceptions advanced by the government as bases for upholding the challenged searches: the inventory exception; an incident-to-forfeiture exception; and the automobile exception.
 

 “It is well established that law enforcement officers may make a warrant-less inventory search of a legitimately seized vehicle,”
 
 Bush,
 
 647 F.2d at 370, provided the inventory is “conducted according to standardized criteria or established routine,”
 
 Bertine,
 
 479 U.S. at 374 n. 6, 107 S.Ct. at 742 n. 6;
 
 see Florida v. Wells,
 
 — U.S. -, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990);
 
 Bertine,
 
 479 U.S. at 374 n. 6, 107 S.Ct. at 742 n. 6;
 
 South Dakota v. Opperman,
 
 428 U.S. 364, 372, 96 S.Ct. 3092, 3098-99, 49 L.Ed.2d 1000 (1976). The requirement that inventory searches be conducted according to such criteria or routine strikes a balance between the government’s legitimate interests in such searches
 
 [5]
 
 and the owner's legitimate expectation of privacy in the contents of the seized vehicle.
 
 [6]
 

 See Wells,
 
 110 S.Ct. at 1638 n. 2 (Brennan, J., concurring);
 
 Bertine,
 
 479 U.S. at 372, 107 S.Ct. at 741;
 
 Opperman,
 
 428 U.S. at 378-80, 96 S.Ct. at 3101-03. On a more practical level, the requirement insures that “police officer[s] ... not be allowed so much latitude that inventory searches are turned into ‘a purposeful and general means of discovering evidence of crime,’ ”
 
 Wells,
 
 110 S.Ct. at 1635 (quoting
 
 Bertine,
 
 479 U.S. at 376, 107 S.Ct. at 743 (Blackmun, J., concurring)), and “guide[s] police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront.”
 
 Bertine,
 
 479 U.S. at 375, 107 S.Ct. at 743 (quotations omitted);
 
 see also Wells,
 
 110 S.Ct. at 1638 n. 1 (Brennan, J., concurring).
 

 Standardized criteria or an established routine governing inventory searches must limit an officer’s discretion in two ways. First, it must limit the officer’s discretion regarding
 
 whether
 
 to search a seized vehicle.
 
 See Bertine,
 
 479 U.S. at 375-76, 107 S.Ct. at 742-44;
 
 United States v. Frank,
 
 864 F.2d 992, 1002-03 (3d Cir.1988) (recognizing necessity of “established police department rules or policy [so that] the officer does not make a discretionary, and perhaps arbitrary[,] determination to search”),
 
 cert. denied,
 
 490 U.S. 1095, 109 S.Ct. 2442, 104 L.Ed.2d 998 (1989). Second, the pre-existing criteria or routine must limit an officer’s discretion regarding the
 
 scope
 
 of an inventory search, particularly with respect to the treatment of closed containers.
 
 [7]
 

 See Wells,
 
 110 S.Ct. at 1635;
 
 *1121
 

 Bertine,
 
 479 U.S. at 374 & n. 6, 107 S.Ct. at 7428 n. 6;
 
 Frank,
 
 864 F.2d at 1003;
 
 Bush,
 
 647 F.2d at 370-71.
 

 The present record contains some evidence that Westmoreland County had a pre-existing policy that all vehicles seized for forfeiture be searched. As Detective Eckels testified, “upon seizing the vehicles [for forfeiture], the vehicles are brought back to the courthouse, placed under a seal of seizure by the District Attorney’s Office, and then search[ed].” App. at 124;
 
 cf. Bertine,
 
 479 U.S. at 375-76, 107 S.Ct. at 742 (finding sufficient policy requiring officers to determine whether to park and lock or impound based on several criteria);
 
 United States v. Kordosky,
 
 921 F.2d 722, 723-24 (7th Cir.1991) (finding sufficient pre-existing, unwritten policy that inventory search be performed on every car seized for forfeiture);
 
 Frank,
 
 864 F.2d at 1003 (finding sufficient pre-existing, unwritten policy making arresting or investigatory officer responsible for conducting inventory search on vehicles seized for forfeiture). However, we need not determine the sufficiency of any such pre-existing policy or established routine governing the decision
 
 whether
 
 to search because, as in
 
 Wells,
 
 the government did not point to any standardized criteria or routine governing the
 
 scope
 
 of inventory searches.
 
 See
 
 app. at 29-81 (suppression testimony of Detective James Williams, who conducted second courthouse search);
 
 id.
 
 at 129-32 (suppression testimony of Detective Paden, who performed first courthouse search). Indeed, Detective Eckels testified that the Westmoreland County Detective Bureau has no written policy regarding inventory search procedures.
 
 See id.
 
 at 124.
 

 Based on the lack of evidence of any criteria or established routine regarding the scope of an inventory search, we conclude that the searching officers had impermissible discretion regarding the scope of the inventory, particularly as to the treatment of closed containers.
 
 [8]
 

 Cf. Wells,
 
 110 S.Ct. at 1635 (finding insufficient absence of any pre-existing policy regarding the treatment of open containers);
 
 Kordosky,
 
 921 F.2d at 723 (finding sufficient policy directing officers to list all items in vehicles on an inventory sheet and to open all closed containers within the vehicles). “An inventory is not an incantation. In the absence of a defined
 
 a priori
 
 policy, an inventory ... cannot be objectively distinguished from a search for evidence of a crime.”
 
 Frank,
 
 864 F.2d at 1016 (Hutchinson, J., dissenting);
 
 see Wells,
 
 110 S.Ct. at 1635 (stating that “[t]he policy or practice governing inventory searches should be designed to produce an inventory” and that “an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence”). Because the record contains no evidence of a policy regarding the scope of an inventory search, we cannot uphold either of the courthouse searches as a lawful inventory search.
 

 We next consider whether, as found by the district court and urged by the government, the existence of a preexisting policy regarding inventory searches is irrelevant because the challenged searches were incident to the vehicle’s lawful seizure for forfeiture. The existence of an incident-to-forfeiture exception to the warrant requirement was suggested by the United States Supreme Court in
 
 Cooper v. California,
 
 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). There, police impounded a vehicle following its owner’s arrest pursuant to a state statute authorizing the seizure of any vehicle used
 
 *1122
 
 to facilitate the commission of narcotics offenses, “such vehicle to be held as evidence until a forfeiture has been declared or a release ordered.”
 
 Id.
 
 at 60, 87 S.Ct. at 790 (quotation omitted). The Supreme Court upheld a warrantless search of the car’s glove compartment which occurred approximately one week after the vehicle’s seizure, stating its rationale as follows:
 

 Here the officers seized petitioner’s car because they were required to do so by state law. They seized it because of the crime for which they arrested petitioner. They seized it to impound it and they had to keep it until forfeiture proceedings were concluded. Their subsequent search of the car — whether the State had “legal title” to it or not — was closely related to the reason petitioner was arrested, the reason his car had been impounded, and the reason it was being retained. The forfeiture of petitioner’s car did not take place until over four months after it was lawfully seized. It would be unreasonable to hold that the police, having to retain the car in their custody for such a length of time, had no right, even for their own protection, to search it.... Under the circumstances of this case, we cannot hold unreasonable under the Fourth Amendment the examination or search of a car validly held by officers for use as evidence in a forfeiture proceeding.
 

 Id.
 
 at 61-62, 87 S.Ct. at 790-91. In the instant case, the government essentially argues that
 
 Cooper
 
 created an incident-to-forfeiture exception authorizing an investigative search of a vehicle seized for forfeiture.
 

 Coopers
 
 rationale, and thus its scope, are unclear, making the opinion susceptible to at least two interpretations.
 
 Cooper
 
 may be interpreted narrowly, as merely authorizing
 
 noninvestigative
 
 inventory searches of cars legitimately in police custody.
 
 See Bertine,
 
 479 U.S. at 372, 107 S.Ct. at 741 (characterizing
 
 Cooper
 
 as inventory search case);
 
 Opperman,
 
 428 U.S. at 368, 373, 96 S.Ct. at 3096-97, 3099 (describing
 
 Cooper
 
 search as “inventory” taken in furtherance of “community caretak-ing functions”);
 
 Cady v. Dombrowski,
 
 413 U.S. 433, 447, 93 S.Ct. 2523, 2530-31, 37 L.Ed.2d 706 (1973) (characterizing
 
 Cooper
 
 as involving inventory search “to guarantee the safety of the [vehicle’s] custodians”);
 
 United States v. Thompson,
 
 925 F.2d 234, 236 (8th Cir.1991) (interpreting
 
 Cooper
 
 as authorizing inventory search of seized car);
 
 United States v. Arango-Correa,
 
 851 F.2d 54, 59 (2d Cir.1988) (interpreting
 
 Cooper
 
 as inventory case). This court has followed this interpretation.
 
 See Bush,
 
 647 F.2d at 370 (citing
 
 Cooper
 
 as authorizing inventory search of legitimately seized vehicle).
 

 Cooper
 
 also may be read more broadly, as permitting a warrantless
 
 investigative
 
 search
 
 of
 
 a car based solely on the fact that the car is subject to seizure under a forfeiture statute.
 
 See United States v. Pace,
 
 898 F.2d 1218, 1245 (7th Cir.) (interpreting
 
 Cooper
 
 as justifying warrantless investigatory search of vehicle seized for forfeiture),
 
 cert. denied,
 
 — U.S. -, 110 S.Ct. 3286, 111 L.Ed.2d 795 (1990);
 
 United States v. $29,000-U.S. Currency,
 
 745 F.2d 853, 856 (4th Cir.1984) (broadly interpreting
 
 Cooper
 
 in dictum);
 
 see also Cady,
 
 413 U.S. at 452-53, 93 S.Ct. at 2533-34 (Brennan, J., dissenting) (characterizing
 
 Cooper
 
 as creating “another exception to the warrant requirement ... which sustains a search in connection with ... forfeiture ... as an integral part of [the authorities’] integral right of retention,” but not specifying what type of search the exception sustains). This broad interpretation is based on the government’s possessory interest in the seized vehicle,
 
 see Pace,
 
 898 F.2d at 1244-45, and on the related notion that a car owner has
 
 no
 
 legitimate expectation of privacy in a vehicle once it is seized for forfeiture,
 
 see United States v. Modica,
 
 663 F.2d 1173, 1177 (2d Cir. 1981) (holding that once automobile seized, owner “lost any expectation of privacy, at least as to the very article contained in the car that justified forfeiture”), ce
 
 rt. denied,
 
 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982).
 

 We decline to embrace a broad reading of
 
 Cooper
 
 on the facts of this case for two reasons. First, it may be that a person whose vehicle is seized pursuant to federal
 
 *1123
 
 forfeiture law loses any legitimate expectation of privacy in the vehicle immediately upon its seizure, thus obviating the need for a pre-existing inventory policy as a means of striking a balance between the government’s interests and the “owner's” legitimate expectation of privacy in the vehicle.
 
 See
 
 21 U.S.C. § 881(h) (1981 & Supp. 1991) (providing that “[a]ll right, title, and interest in property [subject to forfeiture] shall vest in the United States upon commission of the act giving rise to forfeiture under this section”). However, we cannot say that a person whose car is seized pursuant to Pennsylvania’s forfeiture statute loses all legitimate expectation of privacy immediately upon the vehicle’s seizure. Pennsylvania’s statutory scheme has no counterpart to 21 U.S.C. § 881(h).
 
 See
 
 42 Pa. Const. Stat.Ann. §§ 6801 & 6802 (Pur-don Supp.1990). Moreover, the statutory scheme suggests that transfer of title does not occur until after a court hearing is held.
 
 See id.
 
 § 6801(c) (requiring post-im-poundment issuance of process as part of proceeding leading to forfeiture);
 
 id.
 
 § 6802 (detailing procedure for adjudicating forfeiture of property);
 
 see also Commonwealth of Pennsylvania v. One 1988 Suzuki Samurai,
 
 589 A.2d 770, 771 (Pa. Commw.1991) (noting that defendant vehicle not forfeited until government showing of forfeitability at hearing). Thus, a person whose vehicle is seized pursuant to Pennsylvania’s forfeiture scheme retains some legitimate expectation of privacy in the vehicle’s contents.
 

 Second, in light of the differing interpretations of
 
 Cooper,
 
 we cannot say that a warrantless investigatory search of a vehicle as an incident to forfeiture is a “specifically established and well-delineated exception[]” to the fourth amendment’s warrant requirement.
 
 Acevedo,
 
 — U.S. at -, 111 S.Ct. at 1989-93. The Supreme Court has carefully delineated several “jealously and carefully drawn” exceptions to the warrant requirement,
 
 Arkansas v. Sanders,
 
 442 U.S. 753, 759, 99 S.Ct. 2586, 2590-91, 61 L.Ed.2d 235 (1979) (quotation and footnote omitted). Just as “the burden is on those seeking an exemption to show the need for it,”
 
 id.
 
 at 760, 99 S.Ct. at 2591, the burden is on those seeking the creation or recognition of an exemption to show the need for it. The government’s interests in an incident-to-forfeiture search presumably are similar to its interests in an inventory search — protecting an owner’s property while it is in the custody of the police, insuring against claims of lost, stolen, or vandalized property, and guarding the police from danger,
 
 Wells,
 
 110 S.Ct. at 1635. In addition, the government asserts that “ ‘[w]hen a conveyance is seized as forfeita-ble, one naturally expects agents to remove from the vehicle all non-forfeitable property.’ ” Government’s Brief at 246 (quoting
 
 United States v. Judge,
 
 864 F.2d 1144, 1145 n. 1 (5th Cir.1989)). We agree with the government, but see no reason why an investigatory search, as opposed to an inventory search, is necessary to serve this expectation as well as the legitimate government interests implicated upon seizure of a forfeitable vehicle.
 
 [9]
 
 Accordingly, we cannot uphold either of the challenged searches as searches incident to the vehicle’s forfeiture.
 

 Having rejected the government’s inventory search and incident-to-forfeiture arguments, we consider the final basis advanced for upholding the challenged courthouse searches: the automobile exception, which permits warrantless searches of any part of a vehicle that may conceal evidence, including containers, where there is probable cause to believe that the vehicle contains evidence of a crime,
 
 Ross,
 
 456 U.S. at 825, 102 S.Ct. at 2173. Suppression hearing testimony showed that Mithani told Kuhns before the September 6th drug transaction that Washington said he would bring with him guys and guns if the sale involved more than one ounce of cocaine.
 
 See
 
 app. at 86-90, 125-26. At trial, Mithani confirmed that Washington had made that statement.
 
 See id.
 
 at 176-77. Mithani’s statement to the detec
 
 *1124
 
 tives seemingly would provide probable cause for them to believe that Washington’s vehicle contained a weapon: as no guns were found on any of the defendants, the next logical place to look was in the defendants’ cars. Nevertheless, we will not uphold the courthouse searches on this basis because to do so would prejudice Washington unfairly. At the suppression hearing, Washington challenged the veracity of Mithani’s statements regarding his alleged intention to bring weapons to the September 6 transaction:
 

 WASHINGTON’S ATTORNEY: [I]f what is being relied upon for probable cause is the August 13th statements of the confidential informant, then under
 
 Eovierro
 
 (sic) I would request production of the confidential informant and her statements because they would be critical and, in fact, the exclusive evidence that a pistol would be anywhere near Mr. Washington on this occasion.
 

 My point for playing the tape of September 6th is that when you listen to that tape, one, no reasonable person could conclude that Ray Washington was coming armed to the teeth to this meeting.
 

 THE COURT: I would agree with that.
 
 Id.
 
 at 135. This colloquy suggests that the court might have agreed with Washington that the September 6 tape was incredible, leaving the detectives no basis for probable cause to believe that Washington would bring a weapon to the transaction. When the government did not press its probable cause argument,
 
 see id.
 
 at 136, Washington’s attorney stopped arguing that the evidentiary basis for probable cause was incredible, which left the record undeveloped on the issue. For this reason, upholding the search on the government’s probable cause theory would prejudice Washington unfairly.
 

 In light of the foregoing, Washington’s conviction for felony weapon possession will be reversed.
 
 [10]
 
 Washington’s other convictions are unaffected by this reversal, however. Based on the overwhelming evidence of Washington’s guilt as to his conspiracy and two substantive convictions, we can “confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.”
 
 Delaware v. Van Arsdall,
 
 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986);
 
 see also United States v. Hasting,
 
 461 U.S. 499, 508-09, 103 S.Ct. 1974, 1980-81, 76 L.Ed.2d 96 (1982);
 
 United States v. Williams,
 
 892 F.2d 296, 302 (3d Cir.1989),
 
 cert. denied,
 
 — U.S. -, 110 S.Ct. 3221, 110 L.Ed.2d 668 (1990).
 

 4. Entrapment Instructions
 

 We next address Washington’s contention that the district court abused its discretion by refusing to include Washington’s requested entrapment instructions regarding his predisposition to commit the crimes charged. In relevant part, Washington requested inclusion of language reading as follows:
 

 the mere fact that evidence indicates that a defendant was a user of illegal drugs does not establish that he was a predisposed seller of controlled substances who is unable to claim the defense of entrapment. The government must show that the defendant was predisposed to engage in the type of crimes charged in this indictment and not some lesser crime in order to defeat the claim of entrapment.
 

 App. at 844. Instead of giving these instructions, the court instructed the jury that in order to find Washington predisposed, it had to find that he
 

 was ready and willing to commit crimes
 
 such as are charged in the indictment
 
 whenever opportunity afforded.... On the other hand, ... if the evidence in the case should leave you with a reasonable doubt whether the defendant had the previous intent or purpose to commit
 
 an offense of the character charged
 
 apart from the inducement or persuasion of some officer or agent of the government,
 
 *1125
 
 then it is your duty to find him not guilty.
 

 App. at 780 (emphasis added).
 

 Washington contends that his instructions were necessary to advise the jury that his illegal drug use did not make him predisposed to commit the offenses of conspiracy and possession with intent to distribute cocaine. The government argues that the instructions given were a correct statement of entrapment law, and that if the jury followed the instructions, particularly the underlined portions, it could not have found Washington guilty if it believed he was merely predisposed to use drugs rather than to sell them. The entrapment instruction given correctly stated the law regarding predisposition.
 
 See Government of Virgin Islands v. Cruz,
 
 478 F.2d 712, 717 & n. 5 (3d Cir.1973) (stating that predisposition instruction given in present case “is the type of instruction which should be used in the future by district courts in this circuit when entrapment is offered as .a defense”). Thus, the court’s refusal to include the specific language requested by Washington, the essence of which was encompassed in the instructions given, cannot be considered an abuse of discretion,
 
 see United States v. Goldblatt,
 
 813 F.2d 619, 623 (3d Cir.1987) (holding that court need not instruct jury as specifically requested provided instructions given correctly state the law).
 

 5. Extrinsic Evidence
 

 Washington also argues that the district court abused its discretion by not allowing him to cross-examine codefendant Surratt, who testified on his own behalf, regarding whether Mithani, the confidential informant, used cocaine the evening of the initial drug sale. Washington’s proffer, which was in support of his entrapment defense, was that the joint use of cocaine established an intimate relationship between Mithani and himself which afforded Mithani the opportunity to induce him to engage in criminal activity. The evidence, however, also tended to impeach Mithani’s credibility insofar as she had testified that her relationship was casual and had denied using drugs with him while she was a police informant. The court denied Washington’s request on the ground that the evidence was inadmissible as extrinsic evidence to impeach credibility under Rule 608, Federal Rules of Evidence.
 
 [11]
 
 We recognize that although Surratt’s testimony was probably inadmissible as extrinsic evidence to impeach credibility under rule 608(b), it may have been admissible for another purpose.
 
 See United States v. Abel,
 
 469 U.S. 45, 56, 105 S.Ct. 465, 471, 83 L.Ed.2d 450 (1984) (holding that impeachment evidence inadmissible under 608(b) may be admissible for another purpose, as “[i]t would be a strange rule of law which held that relevant, competent evidence which tended to show bias on the part of a witness was nonetheless inadmissible because it also tended to show that the witness was a liar”). As proffered, Surratt’s testimony regarding Mithani’s drug use
 
 might
 
 have been relevant to Washington’s entrapment defense because it would have bolstered to a certain extent his claim that Mithani induced him to commit the offenses through the promise of drugs.
 

 Although it may have had some relevance, we think that its probative value as evidence of entrapment was at best slight. At sidebar during trial, the court considered admission of the evidence at some length.
 
 See
 
 app. at 552-59. Weighing against admission were not only rule 608(b) considerations, but also potential prejudice to Surratt, in that allowing Washington’s counsel to cross-examine Surratt regarding his use of cocaine with Mithani may have undercut Surratt's contention that the September 6 transaction was a complete surprise to him. In a case involving multiple defendants, where a severance has not been requested or granted, such considerations are unavoidable. In light of these considerations, we conclude that the district court’s refusal to allow the line of questioning sought by Washington was not
 
 *1126
 
 an abuse of discretion, because in our view the probative value of that evidence was substantially outweighed by the danger of unfair prejudice,
 
 see
 
 Fed.R.Evid. 403. At worst, given the low probative value of the testimony, the court’s ruling was harmless error.
 

 6. Sentencing Issues
 

 Salmon, Surratt and Washington all challenge their sentences imposed under the Sentencing Guidelines. We review under a clearly erroneous standard the district court’s factual determinations, such as whether a defendant receives a reduced or increased offense level based on his role in the offense,
 
 see United States v. Cianscewski,
 
 894 F.2d 74, 82 & n. 23 (3d Cir.1990), and whether a defendant receives a reduced offense level based on his acceptance of responsibility,
 
 see id.
 
 at 83. Our review of legal issues, such as whether the district court correctly classified Washington as a career offender under the Guidelines, is plenary.
 
 United States v. Preston,
 
 910 F.2d 81, 84 (3d Cir.1990),
 
 cert. denied,
 
 — U.S. -, 111 S.Ct. 1002, 112 L.Ed.2d 1085 (1991).
 

 (a) Salmon
 

 Salmon was given concurrent sentences of fifty-one (51) months for his two convictions: conspiring to possess with intent to distribute less than 500 grams of cocaine and possessing with intent to distribute less than 500 grams of cocaine. He argues that the sentencing court erred in two ways: first, by not granting him minor-participant status and the resulting two-point reduction, instead finding that he played an aggravating role and adding two-points; and second, by not granting him a downward departure based on his work history, family responsibility, role in community affairs and lack of criminal history.
 

 Regarding Salmon’s argument as to his role, the evidence at trial showed that Salmon supplied the cocaine Washington supplied to Kuhns on September 6, 1989, and that Salmon recruited Fitzpatrick for surveillance. Based on this evidence, the district court’s determination that Salmon played an aggravating role as an organizer or leader, and that his offense severity level therefore should be increased, is not clearly erroneous.
 
 See
 
 Guidelines § 3B1.1 application note 3 (noting in part that in determining potential aggravating role court should consider,
 
 inter alia,
 
 “the nature of participation in the commission of the offense, the recruitment of accomplices ... and the degree of control and authority exercised over others by the defendant”).
 

 Salmon’s second argument— that he should have been granted a downward departure based on his work history, family responsibility, role in community affairs and lack of criminal history — also fails. The Sentencing Commission has determined that factors such as family responsibility, work history and ties to the community may not be taken into consideration in determining an appropriate sentence.
 
 See
 
 Guidelines §§ 5H1.5 & 5H1.6 policy statements;
 
 see also
 
 28 U.S.C. § 994(e) (West 1968 & Supp.1991) (directing Commission to “assure that the guidelines and policy statements, in recommending a term of imprisonment or length of a term of imprisonment, reflect the general inappropriateness of considering the ... employment record, family ties and responsibilities, and community ties of the defendant”). Moreover, Salmon’s lack of criminal history was taken into account by his being given a criminal history category of I.
 
 See
 
 Guideline § 4A1.3 policy statement (setting criminal history category for first offender with lowest risk of recidivism at I). Finally, it is well settled that this court lacks the jurisdiction to hear an appeal from a sentencing court’s alleged error to depart downward, except where the court allegedly failed to depart based on a belief that it lacked the power to do so.
 
 See United States v. Denardi,
 
 892 F.2d 269, 271 (3d Cir.1989). Accordingly, this portion of Salmon’s appeal is dismissed.
 

 (b) Surratt
 

 Surratt, who was sentenced to thirty-three (33) months for his sole conviction, of conspiring to possess with intent to dis
 
 *1127
 
 tribute less than 500 grams of cocaine, alleges error on two grounds: the court’s refusal to accord him a four-point downward adjustment as a “minimal” participant, as opposed to a two-point reduction for being a “minor” participant; and the court’s failure to adjust his offense level to reflect that he was convicted only of conspiracy and not of aiding and abetting the August 10 transaction.
 

 We find the court’s determination that Surratt was a minor rather than a minimal participant not clearly erroneous. The evidence showed that Surratt promoted the cocaine Washington was supplying the undercover officer and encouraged future transactions.
 
 See
 
 app. at 230 (stating Surratt told Kuhns that cocaine was of good quality and that “We’re like Allstate; you’re in good hands with us”);
 
 see also
 
 Guidelines § 3B1.2 application note 2 (indicating that “minimal” designation should be used infrequently). Nor was the court’s determination of Surratt’s offense level clearly erroneous. Although the jury was unable to reach a verdict regarding Surratt’s participation in the August 10, 1989 transaction, resulting in the dismissal of Count Two against him, the jury convicted him of the August 9, 1989 through September 6, 1989 conspiracy, which includes both the August and September sales. Because a conspirator is responsible for the acts of his coconspirators within the period of the conspiracy,
 
 see
 
 Guidelines § lB1.3(a)(l), the sentencing court’s consideration of the cocaine transferred on both dates was not clearly erroneous.
 
 See United States v. McDowell,
 
 888 F.2d 285, 291 (3d Cir.1989) (recognizing that government must prove facts relevant to adjustment of sentence level by mere preponderance of the evidence);
 
 United States v. Ryan,
 
 866 F.2d 604, 609 (3d Cir.1989) (holding that sentencing court may consider evidence on counts of which defendant acquitted in determining whether to depart from Guidelines).
 

 (c) Washington
 

 Washington received three concurrent 210-month prison sentences for his three convictions: for conspiring to possess with intent to distribute less than 500 grams of cocaine; and for possessing with the intent to distribute less than 500 grams of cocaine on two occasions. The length of Washington’s sentence is due to the court’s application of the career offender Guidelines to his sentencing. Washington’s appeal from the lengthy sentence is based primarily on two alleged errors: first, the district court’s failure to credit him with a two-level reduction for acceptance of responsibility; and second, the court’s classification of him as a “career offender.” Relevant precedent requires us to deny Washington’s challenges to his sentence.
 

 (1) Acceptance of Responsibility
 

 Section 3El.l(a) of the Sentencing Guidelines authorizes a court to reduce by two levels the sentence of a defendant who “clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct.” The sentencing court determined that Washington was not entitled to such a reduction and stated its reasoning as follows:
 

 Defendant submitted a statement to the Probation Office in which he stated that he participated in the transactions for which he was convicted. However, defendant also asserts a number of excuses for his conduct, including his drug use and his involvement with Sandra Mithani. Defendant claims that he became involved with drug transactions only at the request of Ms. Mithani. Furthermore, defendant characterizes his role in the offenses as minor. And, defendant denies that he “was ever in the business of selling cocaine for profit.” Defendant’s statement to the Probation Office does not demonstrate a clear recognition and affirmative acceptance of personal responsibility for his criminal conduct. Instead, defendant’s statement shows an attempt to minimize and justify his conduct. Therefore, a reduction pursuant to § 3E1.1 is not warranted.
 

 App. at 884-85. Washington asserts that he has clearly acknowledged his participation in the offenses, and adds that he referred to his drug addiction not to justify
 
 *1128
 
 or minimize his conduct, but rather to provide a proper context for the conduct.
 

 In light of the entire record, we cannot say that the court’s determination that Washington had not accepted responsibility for his criminal conduct and therefore was unentitled to a two-level reduction was clearly erroneous.
 
 Cf Cianscewski,
 
 894 F.2d at 83 (finding determination of no acceptance of responsibility not clearly erroneous where defendant continued to contend he was entrapped and refused to cooperate with preparation of presentence report). Because “[t]he sentencing judge is in a unique position to evaluate a defendant’s acceptance of responsibility, ... the determination of the sentencing judge is entitled to great deference on review and should not be disturbed unless it is without foundation.” Guidelines § 3E1.1 application note 5.
 

 (2) Career Offender Classification
 

 Section 4B1.1 of the Guidelines provides the following:
 

 A defendant is a career offender if (1) the defendant was at least eighteen years old at the time of the instant offense, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.
 

 The sentencing judge deemed Washington to be a career offender, finding that the first and second requirements were fulfilled based on the instant offenses and that the third requirement was fulfilled by a 1975 conviction for the sale of heroin and a 1980 conviction for burglary of a dwelling. Washington challenges his career offender classification on two grounds: first, that the sentencing judge erroneously found the heroin and burglary convictions to constitute the necessary predicate offenses; and second, that the sentence denies him his fifth amendment right to due process of law and his eighth amendment right to be free from cruel and unusual punishment.
 

 a. Predicate Offenses
 

 Washington argues that his two prior convictions do not fulfill the requirement of two predicate offenses for three reasons: one, the heroin conviction was more than ten (10) years old; two, the burglary conviction is not a crime of violence; and three, even if the convictions are countable, the career offender guidelines apply where a defendant committed two prior felonies involving controlled substance or two prior felonies involving violence, not where a defendant committed one of each. Each of these arguments fails.
 

 First, the sentencing court’s determination that Washington’s 1975 conviction for the sale of heroin qualifies as a prior felony conviction pursuant to section 4B1.1 of the Guidelines is directly supported by the Guidelines. To be sure, Washington received a suspended sentence for this conviction. As he argues, then, section 4A1.2(e)(2) would preclude counting the conviction.
 
 See
 
 Guidelines § 4A1.2(e)(2) (stating that prior sentences of less than one year and one month should not be counted unless imposed within ten years). However, as the sentencing court accurately noted, section 4A1.2(k)(l) authorizes the court “[i]n the case of a prior revocation of probation” to “add the original term of imprisonment to any term of imprisonment imposed upon revocation.” Section 4A1.2(k)(2) notes that this addition may “affect the time period under which certain sentences are counted.” Once the more than 500 days Washington served upon revocation of his probation are added to the sentence originally imposed for the 1975 conviction, section 4A1.2(e)(1), not section 4A1.2(e)(2), applies.
 
 See
 
 Guidelines § 4A1.2(e)(l) (providing that a prior prison sentence “exceeding one year and one month that was imposed within fifteen years of the defendant’s commencement of the instant offense is counted”). Thus, the court’s determination that Washington’s 1975 conviction for sale of heroin is a prior felony conviction of a controlled substance offense within the meaning of section 4B1.1 is correct.
 

 
 *1129
 
 Second, we consider Washington’s argument that the sentencing court erroneously deemed his 1980 conviction for burglary of a dwelling countable as a crime of violence. The Guidelines in effect at the time of Washington’s sentencing provided the following definition of “crime of violence”:
 

 an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another,
 
 or any other offense that is a felony and that by its nature involves a substantial risk that physical force against the person or property of another may be used in committing the offense.
 

 Guidelines § 4B1.2 (1988) application note 1 (emphasis added). Although the enumeration of crimes of violence following the definition does not include burglary of a dwelling,
 
 see id.,
 
 application note one nevertheless explains that “a burglary of a dwelling would be covered [under the definition],”
 
 see id.
 
 Moreover, the 1989 amendments to the Guidelines clarified which offenses are considered crimes of violence by adding burglary of a dwelling to the enumeration of crimes following the definition of career offender and by stating that both the elements of an offense and the conduct underlying the offense may be relevant to determining whether the offense is a crime of violence.
 
 See
 
 Guidelines § 4B1.2 (1989). These amendments support our conclusion that burglary of a dwelling is a crime of violence under the 1988 Guidelines.
 
 See United States v. John,
 
 936 F.2d 764, 768 n. 3 (3d Cir.1991);
 
 United States v. Brunson,
 
 915 F.2d 392, 393 (8th Cir.1990) (per curiam),
 
 cert. denied,
 
 — U.S. -, 111 S.Ct. 1011, 112 L.Ed.2d 1093 (1991). Our conclusion is supported as well by other courts’ determinations that burglary of a dwelling is a crime of violence because there is a substantial risk that force will be used or that a person will be injured.
 
 See United States v. Gonzalez-Lopez,
 
 911 F.2d 542, 548-49 (11th Cir.1990),
 
 cert. denied,
 
 — U.S. -, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991);
 
 United States v. Smith,
 
 909 F.2d 1164, 1168 (8th Cir.1990);
 
 United States v. Brunson,
 
 907 F.2d 117, 120-21 (10th Cir.1990);
 
 United States v. Pinto,
 
 875 F.2d 143, 144 (7th Cir.1989). We have made a similar determination in the context of the Armed Career Criminal Act, 18 U.S.C. § 924(e).
 
 See United States v. Palmer,
 
 871 F.2d 1202, 1209 (3d Cir.1989) (holding that burglary “presents a serious potential risk of physical injury to another”). In any event, under both the 1988 and 1989 Guidelines we have examined the conduct underlying the prior conviction to determine whether the offense is a crime of violence.
 
 See John,
 
 at 767-68;
 
 United States v. Williams,
 
 892 F.2d 296, 304 (3d Cir.1989),
 
 cert. denied,
 
 — U.S. -, 110 S.Ct. 3221, 110 L.Ed.2d 668 (1990). Here, Washington pleaded
 
 nolo contendere
 
 to a burglary charge in California. His presentence report reveals that the owners arrived home just as Washington was leaving the condominium he had burglarized. A fight ensued, and Washington eventually was subdued by the owners and their neighbors. Because Washington’s conduct involved the use of force, he committed a crime of violence. Thus, the sentencing court’s determination that burglary of a dwelling is a crime of violence within the meaning of section 4B1.1 is correct.
 

 Finally, we reject Washington’s contention that the language of section 4B1.1 requiring that the “defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense” means that the defendant must have committed two prior felonies involving controlled substance or two prior felonies involving violence. We agree with the courts which have considered the question that one felony from each of the two categories fulfills the two-prior-felony requirement.
 
 See, e.g., United States v. Green,
 
 902 F.2d 1311, 1312-13 (8th Cir.),
 
 cert. denied,
 
 — U.S.-, 111 S.Ct. 353, 112 L.Ed.2d 316 (1990);
 
 United States v. Jones,
 
 898 F.2d 1461, 1464-65 (10th Cir.),
 
 cert. denied,
 
 — U.S. -, 111 S.Ct. 111, 112 L.Ed.2d 81 (1990). Thus, the court’s determination that Washington’s 1975 conviction for selling heroin and 1980 conviction for burglary of a dwelling are “two
 
 *1130
 
 prior felony convictions of either a crime of violence or a controlled substance offense” within the meaning of section 4B1.1 is correct.
 

 b. Constitutional Challenges
 

 Washington also challenges his classification as a career offender on two constitutional grounds: first, that the classification denies him due process of law under the fifth amendment because at the time he committed the predicate offenses he was unaware of the effect that the convictions would have on a sentence imposed for future violations of the law; and second, that the classification violates the eighth amendment’s prohibition against cruel and unusual punishment because it does not take into account his drug addiction and is not proportionate to the offenses committed. Under relevant precedent, we must disagree.
 

 Washington’s first claim essentially is that his no-contest and guilty pleas to the predicate offenses were involuntary because he was not informed of the effect they might have in sentencing for the convictions leading to this appeal. Due process requires that a guilty plea be voluntary, that is, that a defendant be advised of and understand the
 
 direct
 
 consequences of a plea.
 
 Brady v. United States,
 
 397 U.S. 742, 755, 90 S.Ct. 1463, 1472, 25 L.Ed.2d 747 (1970). The only consequences considered direct are the maximum prison term and fine for the offense charged.
 
 See United States v. Pearson,
 
 910 F.2d 221, 223 (5th Cir.1990). Due process does not require that a defendant be advised of “collateral, but foreseeable, adverse consequences of the entry of a plea.”
 
 See United States v. Crowley,
 
 529 F.2d 1066, 1072 (3d Cir.1976) (involving plea withdrawal attempt based on alleged involuntariness),
 
 cert. denied,
 
 425 U.S. 995, 96 S.Ct. 2209, 48 L.Ed.2d 820 (1976);
 
 see also United States v. Russell,
 
 686 F.2d 35, 38 (D.C.Cir.1982) (noting that “[c]ertain consequences of a guilty plea are ‘collateral’ rather than direct ... and need not be explained to the defendant in order to ensure that the plea is voluntary”). The effect of a conviction on sentencing for a later offense under a career offender law is such a collateral consequence.
 
 See Crowley,
 
 529 F.2d at 1072 (citing
 
 United States v. Cariola,
 
 323 F.2d 180, 186 (3d Cir.1963)). Washington does not allege that he did not understand the direct consequences of his two previous pleas at the time he entered them. Nor does he allege that in the
 
 instant
 
 prosecution he failed to receive adequate-notice of the possibility of sentence enhancement based on recidivism.
 
 See Pearson,
 
 910 F.2d at 223. Accordingly, the court’s classification of Washington as a career offender does not violate his due process rights.
 

 Finally, we consider Washington’s two-fold eighth amendment claim: first, that his 210-month sentence does not reflect mitigating considerations such as his drug addiction; and second, that the sentence is excessive compared both to the nature of the crime and to the sentences received by others for the same crime. In the controlling case of
 
 Harmelin v. Michigan,
 
 — U.S. -, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), the Supreme Court recently held that a mandatory life sentence without possibility of parole imposed for a first offense of possessing with the intent to distribute 672 grams of cocaine is not cruel and unusual punishment prohibited by the eighth amendment.
 
 Id.
 
 — U.S. at -, -, 111 S.Ct. at 2683-85, 2701-03. The reasoning underlying the Court’s holding requires us to reject Washington’s two arguments. First, a majority of the Court concluded that the eighth amendment requires individualized sentencing only in capital sentences.
 
 See id.
 
 at -, 111 S.Ct. at 2701-03. Thus, just as Harmelin was not guaranteed a sentencing procedure which took into account his lack of prior convictions, Washington was not guaranteed sentencing which considered mitigating circumstances such as his drug addiction. Second, the
 
 Harmelin
 
 Court effectively held that the eighth amendment “forbids only extreme sentences that are ‘grossly disproportionate’ to the crime.”
 
 Id.
 
 at-, 111 S.Ct. at 2705 (quoting
 
 Solem v. Helm,
 
 463 U.S. 277, 288, 103 S.Ct. 3001, 3008-09, 77 L.Ed.2d 637 (1983)) (Ken
 
 *1131
 
 nedy, J., concurring). Comparing Washington’s crimes to the sentences imposed, we cannot say that the sentences are “grossly disproportionate.”
 
 Cf id.
 
 — U.S. at -, 111 S.Ct. at 2683-85;
 
 Rummel v. Estelle,
 
 445 U.S. 263, 265-66, 100 S.Ct. 1133, 1134-35, 63 L.Ed.2d 382 (1980) (upholding life sentence of person convicted of three thefts totaling $229);
 
 Hutto v. Davis,
 
 454 U.S. 370, 370-72, 102 S.Ct. 703, 703-04, 70 L.Ed.2d 556 (1982) (per curiam) (upholding 40-year sentence of person convicted of possessing with intent to distribute nine ounces of marijuana);
 
 United States v. Whyte,
 
 892 F.2d 1170, 1175-76 (3d Cir.1989), ce
 
 rt. denied,
 
 — U.S. -, 110 S.Ct. 1793, 108 L.Ed.2d 794 (1990) (upholding 35-year sentence imposed for third offense involving $4,000 of crack cocaine and the use of a weapon against a police officer). Thus, we need not compare Washington’s sentences with those received by others convicted of the same offenses.
 
 See Harmelin,
 
 — U.S. at -, 111 S.Ct. at 2705-07 (explaining that “intra- and inter-jurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality”) (Kennedy, J., concurring). The district court’s classification of Washington as a career offender under the Guidelines was constitutional as well as statutorily correct. Having reached this conclusion, we need not remand Washington’s case for resentenc-ing.
 
 [12]
 

 C. CONCLUSION
 

 In light of the foregoing, we will REVERSE Fitzpatrick’s convictions and vacate his sentences; AFFIRM the convictions and sentences of Salmon and Surrat; and REVERSE Washington’s conviction for felony weapon possession and vacate his 120-month concurrent sentence and $50 assessment, but AFFIRM his other convictions and sentences imposed under the career offender Guidelines. Insofar as Salmon objects to the court’s failure to make a downward departure in connection with his sentence, the appeal will be dismissed.
 

 [1]
 

 . The government argues that any unawareness on Fitzpatrick’s part as to the nature of the activities was due to his conscious avoidance of the truth,
 
 see United States v. Caminos,
 
 770 F.2d 361, 365-66 (3d Cir.1985). Because the prosecutor did not argue a deliberate ignorance theory to the jury,
 
 see
 
 app. at 653-88, and the court did not instruct the jury on such a theory,
 
 see id.
 
 at 757-991, upholding Fitzpatrick’s convictions on the basis of a conscious avoidance theory would deny him due process, as he was never given an opportunity to rebut the theory at trial.
 
 See United States v. Rockwell,
 
 781 F.2d 985, 990 n. 7 (3d Cir.1986).
 

 [2]
 

 . In light of this disposition, we need not address Fitzpatrick’s challenges to the court’s aiding-and-abetting instructions, peremptory challenge ruling, and admission of allegedly conclu-sory testimony by a detective.
 

 [3]
 

 . The district court reasoned as follows:
 

 Courts which have examined searches conducted subsequent to a seizure for purposes of forfeiture have held that once a vehicle is lawfully in the government's possession, it may be searched at any time, and evidence found in the course of the search is admissible.
 
 United States v. Linn,
 
 880 F.2d 209 (9th Cir.1989).
 
 See also United States v. Johnson,
 
 572 F.2d 227 (9th Cir.1978);
 
 United States v. Alvarez,
 
 833 F.2d 724 (7th Cir.1987);
 
 United States v. 29,000
 
 —U.S.
 
 Currency,
 
 745 F.2d 853 (4th Cir.1984). Whether or not forfeiture proceedings have been instituted in this case is of no consequence. What is important, however, is that when the vehicle was searched, it
 
 *1119
 
 was in the custody of detectives under the authority of forfeiture statutes.
 
 United States v. Johnson,
 
 572 F.2d 227, 234 ([9th Cir.] 1978).
 

 App. at 877-78.
 

 [4]
 

 . The statute reads more fully as follows:
 

 § 6801. Loss of property rights to Commonwealth
 

 (A) FORFEITURES GENERALLY. — The following shall be subject to forfeiture to the Commonwealth and no property right shall exist in them:
 

 (1) All ... controlled substances or other drugs which have been ... distributed ... or acquired in violation of ... The Controlled Substance, Drug, Device and Cosmetic Act....
 

 (4) All conveyances, including ... vehicles ... which are used or are intended for use to transport, or in any manner to facilitate the transportation, sale, receipt, possession or concealment of, property described in paragraph (1) or (2)
 

 Pa. Const. Stat.Ann. § 6801(A)(1), (4) (Purdon Supp.1990).
 

 [5]
 

 . Inventory searches " ‘serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger.’”
 
 Wells,
 
 110 S.Ct. at 1635 (quoting
 
 Bertine,
 
 479 U.S. at 372, 107 S.Ct. at 741).
 

 [6]
 

 . Although one’s “expectation of privacy with respect to one’s automobile is significantly less than that relating to one’s home or office,”
 
 California v. Carney,
 
 471 U.S. 386, 391, 105 S.Ct. 2066, 2069, 85 L.Ed.2d 406 (1985) (quotation omitted), “[t]he word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears,”
 
 Coolidge
 
 v.
 
 New Hampshire,
 
 403 U.S. 443, 461-62, 91 S.Ct. 2022, 2035, 29 L.Ed.2d 564 (1971).
 

 [7]
 

 .Because the Supreme Court's decision in
 
 Acevedo, supra,
 
 involved the automobile exception to the warrant requirement and not an inventory search,
 
 see Acevedo,
 
 — U.S. at -, 111 S.Ct. at 1991-92, the requirement that inventory searches be conducted according to standardized criteria or established routine remains.
 

 [8]
 

 . The government, apparently assuming that inventory searches must be performed pursuant to standardized criteria only as to containers, argues that the discovery of the weapon was valid under the plain view exception to the warrant requirement,
 
 see Horton v. California,
 
 — U.S. -, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), because the weapon could be seen through the opening of the gym bag. We could not uphold the search on that basis even if the government's assumption was true. At the suppression hearing, counsel for the government and Washington stipulated that "a weapon had been observed in the trunk of the car at the scene” of the arrests by an unidentified detective.
 
 See
 
 app. at 128. Just as the detective was unavailable to testify as to whether he had probable cause to believe the car contained a weapon,
 
 see id.,
 
 he was unavailable to testify as to whether the gym bag was in fact open and the weapon in plain view when he opened the trunk.
 

 [9]
 

 . Indeed, the case cited by the government in support of its expectation that agents will remove from a forfeitable vehicle all non-forfeita-ble property upheld an
 
 inventory
 
 search of a seized vehicle.
 
 See Judge,
 
 864 F.2d at 1147.
 

 [10]
 

 . Thus, we need not reach Washington’s challenges to the district court’s rulings regarding his “antique weapon” defense.
 

 [11]
 

 . "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness’ credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence.” Fed.R.Evid. 608(b).
 

 [12]
 

 . Washington’s offense level as a career offender is determined by the statutory maximum for the instant offense. Because the government did not properly file information concerning Washington’s prior heroin conviction as required by 21 U.S.C. § 851,
 
 see
 
 app. at 818, the maximum sentence Washington could have received was 20 years,
 
 see
 
 21 U.S.C. § 841(b)(1)(C). Washington’s offense level thus is 32,
 
 see
 
 Guidelines § 4B1.1, while his criminal history category is VI,
 
 see id.,
 
 giving him a sentencing range of 210-262 months. The district court sentenced Washington to 210 months on Counts One, Two and Three, and 120 months on Count Five, the weapon-possession charge, all to be served concurrently. He also was specially assessed $50 for each count, for a total of $200. Our reversal of his conviction of Count Five therefore will vacate only his 120-month concurrent sentence and $50 assessment.