UNITED STATES of America, Plaintiff,

v.

Michael KAPRAL, Defendant.

Crim. No. 94–448.

United States District Court,
D. New Jersey.

Jan. 13, 1995.

Howard Wiener, Asst. U.S. Atty., Office of the U.S. Atty., Camden, NJ, for plaintiff.

Arthur E. Ballen, Lorraine DiCintio, Ballen, Gertel & DiCintio, Camden, NJ, for defendant.

## OPINION

WOLIN, District Judge.

This matter has been opened before the Court upon the motion of the defendant Kapral to suppress evidence seized from his vehicle, a Chevrolet "Blazer." The Court has

received written submissions from the parties, heard the oral arguments of counsel, and held a hearing on this matter at which the testimony of witnesses was received. Upon consideration of the foregoing and for the reasons discussed below, the Court will deny the motion to suppress.

## BACKGROUND

Defendant is charged with distributing and conspiring to distribute in excess of a kilogram of methamphetamine, in violation of 21 U.S.C. § 841(a)(1). Frederick Cress is an alleged co-conspirator. Some knowledge of the details of the investigation that led up to the arrest of Cress and Kapral and the search of the Blazer is necessary to evaluate the government's argument that the evidence from the Blazer should be admitted. The following facts are taken from affidavits sworn in support of applications for telephone surveillance and a search warrant of Kapral's premises, and from the oral testimony of the investigating officers. Their truth is accepted for the purposes of this motion only.

Acting through an undercover investigator, the government had come in contact with Cress and was aware that he was a seller of illegal drugs. In order to acquire evidence against Cress and to determine his source for the drugs, the government placed a pen register on Cress's phone and initiated a series of drug transactions with him.

One of these transactions took place on January 8, 1992. Cress and the investigator met at a bar. In the course of conversing with the investigator, Cress referred to someone named "Loop" as his source. The government was aware that Loop was an alias for Kapral. The investigator handed over the money, and Cress left the bar. The police surveillance team was unable to follow Cress, and several hours later he returned with the drugs. Cress again mentioned Loop as his source.

At this time the government obtained a warrant to place a wiretap on Cress's phone. On February 19, another transaction was set up. On February 20, Cress went to Kapral's house in West Berlin, New Jersey and then returned to his own house in Atlantic City. Later that day, Cress again sold drugs to the investigator.

On March 4, the investigator called Cress at his house and placed an order for one-half pound of methamphetamine. About an hour later, Cress left home and drove to Kapral's house. That afternoon, Cress delivered the requested amount of drugs to the investigator.

On March 10, Cress admitted to the investigator that Kapral was his source for drugs. On March 23, a warrant was obtained to search Kapral's house. The government had previously determined that it would seize Kapral's Blazer pursuant to the civil forfeiture statute.[1] On the 24th, the investigator contacted Cress and arranged to buy a pound of methamphetamine. Cress was again observed going to Kapral's residence. Kapral was observed to arrive in the Blazer. Upon his entry into the house police entered and arrested both of them and began to execute the search warrant.

When the search of the house failed to turn up any drugs, the investigators turned their attention to the Blazer. Upon searching it, they found approximately $20,000 in cash in two bags and a wallet. At the conclusion of the search of the premises, the investigators drove the vehicle to the prosecutor's office and, in the next day or so, it was delivered to the offices of the Drug Enforcement Agency.

There the Blazer was subjected to an inventory search by federal agents Paccione and a colleague. Nothing further of evidentiary value was found.

## DISCUSSION

The government does not dispute that there was no warrant to search the Blazer. The government claims that the search of the car was permissible because (1) they had probable cause to search the vehicle and so the search was within the auto exception to the warrant requirement, (2) the vehicle was

---

1. It is not clear whether the forfeiture was in connection with the drug charge or some other prosecution of Kapral. The question is irrelevant to this motion however.

subject to forfeiture and the warrant requirement does not extend to forfeited property, and (3) the evidence would inevitably have been discovered by the subsequently conducted inventory search which was proper under the inventory search exception to the warrant requirement.

■ Under the *Carroll* doctrine, the automobile exception to the warrant requirement, authorities may search a motor vehicle without a warrant if they have probable cause to believe it contains the fruits or instrumentalities of a crime. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *see also Colorado v. Bannister,* 449 U.S. 1, 101 S.Ct. 42, 66 L.Ed.2d 1 (1980). In this case, the Court finds the investigators did not have probable cause as to the Blazer.

■ The government claims that the pattern of behavior developed by the ongoing investigation of Kapral coupled with their failure to discover drugs in Kapral's house gave rise to probable cause to believe that the Blazer contained the drugs. They assert that the prior instances in which Cress had sold drugs to the undercover investigator soon after meeting Kapral at his house gave rise to a belief that the drugs were transferred at those meetings. The government points to the fact that the investigators had ample reason to believe that Kapral was meeting Cress at his house on the day of the arrest in order to sell him drugs and that Kapral arrived at the house in the Blazer.

So far, however, the facts giving rise to probable cause do not point to the Blazer, but to the premises for which the authorities already had procured a warrant. The record contains no indication that the investigators had any reason to believe that Kapral was bringing the drugs to the house in the Blazer as opposed to having reason to believe that the drugs were stored in the house already. *See* Transcript of Hearing January 10, 1995 ("Tr.") at 56–57. Indeed, despite the efforts of the Assistant United States Attorney to elicit testimony to the contrary, it is clear that, prior to searching the house, the investigators actually believed the drugs were stored in the house or on its grounds. Tr. at 47–49.

The government's argument continues that, forearmed with the belief that Kapral had travelled to the house to do a deal, and having failed to find the drugs in the house, probable cause arose for the investigators to believe the drugs were still in the Blazer. The Court rejects this argument as proving too much. Failure to find a piece of evidence in one place should not be permitted to give rise to probable cause to believe that the evidence is somewhere else. There is no principled end to the probable cause chain under the government's theory.

■ The government's second argument against the motion to suppress relies on the fact that the Blazer was subject to forfeiture, and that it had been seized pursuant to that forfeiture before the initial search took place.[2] The Court rejects this argument as well, because it rests on an erroneous reading of the law in this circuit concerning the permissibility of warrantless, investigatory searches of forfeited property.

· *Cooper v. California,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967), held that a warrantless search of a vehicle that was impounded by authorities under a state forfeiture statute was permissible under the Fourth Amendment. However, the Third Circuit, citing varying characterizations of *Cooper* by later Supreme Court cases, and other circuits, has chosen to read *Cooper* narrowly. *United States v. Salmon,* 944 F.2d 1106 (3d Cir.1991), *cert. denied,* 502 U.S. 1110, 112 S.Ct. 1213, 117 L.Ed.2d 451 (1992). After *Salmon,* it appears that *Cooper* only permits an inventory of the contents of forfeited vehicles as opposed to a full investigatory search for evidence. The inventory must be made pursuant to "standardized criteria or established routine," *id.* at 1120 (citing *Colorado v. Bertine,* 479 U.S. 367, 374, 107 S.Ct. 738, 742, 93 L.Ed.2d 739 (1987)), consistent with the classic inventory exception to the warrant requirement, discussed below.

**2.** Defendant does not dispute the fact of the forfeiture, although the forfeiture is now being contested.

The government's argument that *Salmon* does not apply to vehicles forfeited under the federal forfeiture statute, 21 U.S.C. § 881(h), is incorrect. The *Salmon* court rested its narrow reading of *Cooper* on two independent grounds, only one of which was the nature of the state forfeiture statute at bar. The Court also found that, given the uncertain status of *Cooper*, investigatory searches of forfeited vehicles no longer came within a " 'specifically established and well-delineated exception[ ]' to the warrant requirement" as required by *California v. Acevedo*, 500 U.S. 565, 580, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991). *Salmon*, 944 F.2d at 1123 (quoting *Acevedo* ).

It is clear from the testimony of the investigators that the initial search at Kapral's house was not an inventory search within the legal definition of that term, but instead was an investigatory search for evidence or contraband. Tr. at 53, 109. This does not mean that the money seized must be excluded, however, because the governments third and final argument will suffice to defeat the motion to suppress.

 The government argues that the inventory of the contents of the Blazer at the DEA offices a day or so after the raid was permissible as within the inventory exception to the warrant requirement. Against the objection that the evidence was discovered during the initial search, and not during the later inventory, the government relies on the "inevitable discovery" rule. This rule holds that, even though evidence may have been acquired in violation of Fourth Amendment rights, if authorities inevitably would have discovered it in some other constitutionally permissible manner, the evidence will not be excluded. *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984).

The investigators have testified that the money seized was not hidden in any compartment of the car, but was found on the floor of the passenger compartment. Tr. at 62. Thus there can be no question that an inventory search would have discovered it. Accordingly, the issue is whether the inventory search comported with the requirements laid down by the Supreme Court for a constitutionally valid inventory search.

In *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987), the High Court restated the test for a valid inventory search. First, the search must be conducted according to standard criteria. *Id.* at 375, 107 S.Ct. at 743. Second, the motive for the search must be based on "something other than suspicion of evidence of criminal activity." *Id.* In *Salmon*, the Court of Appeals expanded on the first prong. 944 F.2d at 1120. The court explained that criteria governing the search must limit the officer's discretion over whether to search the vehicle, as well as over the scope of the search, particularly in connection with sealed containers. *Id.* As to the second, "the policy or practice governing inventory searches must be designed to produce an inventory." *Florida v. Wells*, 495 U.S. 1, 4, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990). It may not be "a ruse for a general rummaging in order to discover incriminating evidence." *Id.*

Here the government has offered pages from the DEA training manual, and an administrative order concerning inventory searches to show that this inventory was conducted according to standard criteria. Exhibits SH–1, SH–2. Upon review of these submissions and the testimony of the DEA officers, the Court finds that the search of the Blazer was a permissible inventory search. Officers are required to "thoroughly" search all vehicles that have been forfeited, including all containers within the vehicle. The regulations state that the purpose of the search must be to make an inventory of the vehicle's contents. Any articles that are not part of the vehicle and are not of evidentiary value must be returned to the owner. The testimony of agent Paccione shows that he was complying with these regulations when he did the inventory. Tr. at 132–33, 137–38.

Defendant may object that too much discretion is allowed the officers in performing the search. The Court finds, however, that the regulations here provided the investigators with sufficient guidance. In dictum, the Supreme Court has said that a policy of requiring police to open *all* containers found during an inventory search sufficiently con-

fines their discretion and is "unquestionably permissible." *Wells,* 495 U.S. at 4, 110 S.Ct. at 1635. Moreover, the case law is clear that the rules surrounding inventory searches need not be so strict that searches are conducted mechanically or in an " 'all or nothing' fashion." *Id.* Finally, although the Court might prefer to see a policy with more detail, the Constitution does not require the authorities to apply the ideal regulations, only that those regulations be constitutionally reasonable. *Bertine,* 479 U.S. at 373–74, 107 S.Ct. at 742.

### CONCLUSION

Accordingly, the Court holds that the search of the Blazer conducted at the DEA offices by agent Paccione and his colleague was a valid inventory search. The money discovered earlier while the vehicle was at Kapral's residence inevitably would have been discovered during the inventory search. Therefore, it may not be excluded on the grounds of an illegal search and seizure. The motion to suppress the evidence seized from the Blazer will be denied.