**UNITED STATES OF AMERICA, Plaintiff**

**v.**

**HUBERT FREDERICKS, Defendant**

Case No. 96-229

District Court of the Virgin Islands

Div. of St. Thomas and St. John

January 11, 1999

366

SARAH WEYLER, United States Attorney., *for plaintiff*

HOWARD STEWART, Senior Litigation Counsel, Department of Justice Environmental Crimes Section, *for plaintiff*

CHARLES HERNDON, *for defendant*

MOORE, *Chief Judge*

## REVISED MEMORANDUM

The motion of defendant, Hubert Fredericks ["Fredericks"], for judgment of acquittal and, in the alternative, for new trial on Count II of the superseding indictment will be denied.

## FACTUAL BACKGROUND

On October 16, 1998, Hubert Fredericks was convicted by a jury of the felony of failing to notify immediately the appropriate federal agency of the discharge of oil from the *M/V Venture Pride* into Cruz Bay, St. John, on or about March 26, 1998, in violation of 33 U.S.C. § 1321(b)(5).

The Government presented evidence that around 11:00 a.m. on March 26, 1995, an employee at the American Yacht Harbor in Red Hook, St. Thomas, informed Lt. Keith Janssen ["Janssen"] of the Coast Guard Marine Safety Detachment in St. Thomas of an oil discharge. Janssen arrived in Red Hook at 11:30 a.m., and interviewed witnesses. One witness advised Janssen that he had seen the vessel, a ferry boat, discharging 'black oil' in a steady stream from the overboard discharge on the starboard side of the ferry as it departed Red Hook bound for Cruz Bay, St. John. Janssen took a sample from a sheen on the water which the witness identified as having come from the oil discharged from the ferry.

While Janssen was still interviewing the witness, the vessel, identified as the *M/V Venture Pride*, returned to Red Hook at

approximately 12:20. Upon boarding the ferry, Janssen was informed that the captain, Fredericks, was not on board. After instructing a crew member to find the captain, Janssen went into the engine room. Janssen observed a large amount of oil in the bilge and a hose leading from a submersible bilge pump, a Rule 2000 [the "pump"], to the overboard discharge and took samples of oil from the bilge. He also took an oil sample from the outside of the hull at the overboard discharge.

Lt. Janssen then interviewed members of the crew. Clarence Stephenson advised that, when the *Venture Pride* entered Cruz Bay, passengers saw oil being discharged, and that he and another crew member went to the engine room and saw the bilge pump switch in the "on" position. Stephenson said that the other crew member, in his presence, attempted to turn the switch off, but to no avail. Stephenson then alerted Fredericks. (At trial, Stephenson could not recall speaking to Janssen.)

Fredericks told Janssen that he, in turn, manipulated the switch and it ultimately turned off. Fredericks told Janssen that he pulled the hose from the overboard discharge, but Janssen testified that the hose was attached to the overboard discharge when Janssen boarded the *Venture Pride*. Fredericks also told Janssen that he observed crew members dispersing the oil with Joy dishwashing soap when he went back above deck, and that he did not try to stop them.

Lt. Janssen learned that the *Venture Pride* had remained in Cruz Bay for 40 minutes before returning to Red Hook. The Government established that there are several telephones no more than 200 feet from the Cruz Bay ferry dock where the *Venture Pride* had tied up, that there was an operable marine radio aboard, and that the offices of Varlack Ventures, the corporate operator of the *Venture Pride*, are a three minute walk from the dock. The prosecution also introduced a certificate that no report of the St. John spill was made to the National Response Center or any other federal or territorial agency. Lt. Janssen testified that Fredericks admitted that he knew that the *Venture Pride* had spilled oil at Cruz Bay earlier that morning of November 26, 1996, and that he had told no one about it.

Two days later, Janssen and another Coast Guard officer returned to the *Venture Pride* and videotaped the operation of the

pump and switch. The officers testified that both operated properly and the tape was shown to the jury. An electrical engineer testified at trial as an expert and opined that, based on the Coast Guard videotape and his independent examination of the switch, the switch and pump were properly wired and operated properly. He testified that the switch would not have been able to turn on by itself and would have to have been operated manually. A Rule Industries executive also testified that based on the videotape, the pump was operating properly. This testimony was corroborated by the statement given to Janssen by the crew-member, Clarence Stephenson, that the switch was turned on when he entered the engine room while the ferry was on St. John.

## MOTION FOR JUDGMENT OF ACQUITTAL

The defendant raises four errors in his motion for judgment of acquittal under Federal Rule of Criminal Procedure 29, only three of which merit discussion. He alleges that the Government failed to present sufficient evidence that Fredericks was aware of the alleged discharge or that Fredericks did not immediately notify the appropriate agency. He also argues the conviction is contrary to the weight of the evidence. Finally, he argues that he was selectively prosecuted.[1]

### Sufficiency of the Evidence

■ This Court must examine the evidence in the light most favorable to the Government to determine if a reasonable juror could find Fredericks guilty beyond a reasonable doubt. *United States v. Salmon*, 944 F.2d 1106 (3d Cir. 1991), *cert. denied sub. nom. Washington v. United States*, 502 U.S. 1110, 117 L. Ed. 2d 451, 112 S. Ct. 1213 (1992).

Fredericks was convicted of violating 33 U.S.C. § 1321(b)(5), which provides:

> Any person in charge of a vessel . . . shall, as soon as he has knowledge of any discharge of oil . . . from such

---

[1] He also argues that "the jury did not give sufficient consideration to the evidence." The defendant argues that the jury could not, in the little over two hours that they were in deliberations, properly have considered the evidence, thereby depriving him of his right to due process and a right to a fair and impartial jury. Such a claim does not warrant any consideration.

vessel . . . immediately notify the appropriate agency of the United States Government of such discharge . . . .

33 U.S.C. § 1321(b)(5).

To be a violation, the quantity of oil must be a "harmful quantity." The Environmental Protection Agency has defined a "harmful quantity" to include discharges of oil that:

(a) Violate applicable water quality standards, or

(b) Cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines.

40 C.F.R. § 110.3 (The 1994 version governs since any revisions were promulgated in July, 1995, after the date of the oil discharge). This definition is subject to a limited exception, namely, that

discharges of oil from a properly functioning vessel engine are not deemed to be harmful, but discharges of such oil accumulated in a vessel's bilge shall not be so exempt.

40 C.F.R. § 110.7 (1994).

■ The Government presented evidence that the *Venture Pride* pumped a sufficient amount of oil to create a sheen and attract the attention of passengers in Cruz Bay. A crew-member saw oil in the water. The defendant was aware of the discharge, since his own statement to Janssen was that he attempted to turn off the bilge pump and, after doing so, saw crew-members dispersing the oil with detergent. Janssen also testified that Fredericks admitted that he had not informed anyone.

Fredericks further asserts, however, that the Government failed to prove that he did not "notify" the appropriate agency because Fredericks notified Janssen of the discharge during the interview. Such a contention is absurd. It would fly in the face of the spirit and letter of section 1321(b)(5) to allow an acknowledgment by a defendant, confronted with evidence of a discharge gathered through independent means, to qualify as the immediate notification required by the statute.

370

Fredericks' second contention about the notification raised the appropriate agency to be notified.

> 40 C.F.R. § 110.10 provides
>
> Any person in charge of a vessel or of an onshore or offshore facility shall, as soon as he or she has knowledge of any discharge of oil from such vessel or facility in violation of § 110.6, immediately notify the National Response Center (NRC) (800-424-8802; in the Washington, DC metropolitan area, 426-2675). If direct reporting to the NRC is not practicable, reports may be made to the Coast Guard or EPA predesignated On-Scene Coordinator (OSC) for the geographic area where the discharge occurs. All such reports shall be promptly relayed to the NRC. If it is not possible to notify the NRC or the predesignated OCS immediately, reports may be made immediately to the nearest Coast Guard unit, provided that the person in charge of the vessel or onshore or offshore facility notifies the NRC as soon as possible. The reports shall be made in accordance with such procedures as the Secretary of Transportation may prescribe. . . .

40 C.F.R. § 110.10 (1994).

Fredericks asserts that the certificate of the National Response Center ["NRC"] only confirms that no report was made to the NRC on the 26th or 27th of March. He contends that it does not prove that no report was made after that date, or that no report was made to another agency. Such argument lacks merit, especially since the Government introduced Janssen's testimony that Frederick told him on the day of the spill that he had not notified anyone (let alone the NRC, Coast Guard or an On-Scene Coordinator),[2] despite the ready availability of telephones at the dock in Cruz Bay and the operable marine radio on the *Venture Pride*.

---

[2] Since the Government showed that no attempt was made to report the spill to the NRC or to the Coast Guard, it is irrelevant whether or who had been designated as an On-Scene Coordinator.

371

### Evidence of Selective Prosecution

■ The Government moved in limine to exclude any evidence relating to selective prosecution by Janssen because Janssen investigated the incident not of his own discretion, but based on a complaint from a citizen. Further, it was the Department of Justice, not the Coast Guard, that decided to prosecute. At conference before the trial, the Court indicated that it was inclined to grant the motion, as such evidence would be irrelevant under Federal Rule of Evidence 401 and more prejudicial than probative under Rule 403. Defense counsel agreed that the evidence was irrelevant and indicated that he did not wish to present any such evidence. The Court, having considered the matter further, can still find no relevance, much less any error in excluding this evidence.

## MOTION FOR NEW TRIAL

The defendant raises eight arguments in his motion for a new trial under Federal Rule of Criminal Procedure 33. The arguments raised in his motion for judgment of acquittal already have been disposed of and merit no further mention here. The defendant alleges error in admitting his statement to Janssen about the Cruz Bay spill under the immunity provided by 33 U.S.C. § 1321(b)(5), error in instructions defining "immediately" and good character, error in stating the elements required to be proved regarding "reportable quantity," and error in not allowing corporate counsel to put on a defense witness.

### Section 1321(b)(5) "Immunity"

■ The defendant unsuccessfully moved to prevent Janssen from testifying to the content of his interview with Fredericks. He argues that presentation of the defendant's statement is barred by the last sentence of section 1321(b)(5): "Notification received pursuant to this paragraph shall not be used against any such natural person in any criminal case, except a prosecution for perjury or for giving a false statement." Counsel was unable to provide the Court with any authority to support his contention that this provision immunizes a captain who only tells the Coast Guard about a spill from his boat after he has been caught. Admitting to the spill during an official investigation of the

circumstances of the spill is not the notification encouraged by section 1321(b)(5). The immunity provided in the last sentence of section 1321(b)(5) can in no way reasonably be construed to offer protection under the facts before the Court.

## Jury Instructions

■ Defendant argues error concerning the meaning of "immediately," which is not defined in the Clean Water Act. This Court, therefore, relied on defendant's proposed definition and WEBSTER'S THIRD NEW WORLD DICTIONARY (1993) to fashion the following instruction:

### "Immediately" Defined

The term "immediately" means without interval of time, without delay, straightway, or without any lapse of time. The term implies prompt, vigorous action without any delay. The term "immediate" must be interpreted in light of the circumstances of this particular case.

(Jury Instructions at 25.) The first two sentences are concepts derived from the dictionary. The last sentence is taken directly from defendant's requested instruction. The Court cannot find that this definition worked any prejudice against the defendant.

Fredericks also argues that the interests of justice require a new trial based on the failure of this Court to give the defendant's requested jury instruction on good character. The Court instead gave the following instruction:

### Good Character

**Hubert Fredericks** has offered evidence of his good character for truth and veracity. The jury should consider this evidence along with all the other evidence in the case in making its determination as to whether the Government has proved, beyond a reasonable doubt, that Mr. Fredericks committed the crimes alleged in the indictment.

(Jury Instructions at 6.)

■ The defendant's requested instruction would have allowed the jury to acquit the defendant based on good character "standing alone." The United States Court of Appeals has already ruled that the refusal to give the "standing alone" instruction is not error. *United States v. Spangler*, 838 F.2d 85, 86-87 (3d Cir. 1988), *cert. Denied*, 486 U.S. 1033 (1988).

Finally, the defendant argues that the Court did not properly instruct the jury on the meaning of "reportable quantity" as used in the definition of the elements of the offense of failing to report a discharge of oil. This claim must be rejected because defense counsel never raised it so the Court could address it, either before or after it was given. This particular instruction was provided by the Government and defense counsel had a copy of it well before the close of evidence. Not having raised this objection before the jury received the case, the defendant may not raise it for the first time now that the jury has returned its verdict.

The jury was advised that Fredericks was charged with knowing that the *Venture Pride* had discharged oil while he was in charge and failing to immediately notify the Coast Guard of the discharge, in violation of the Clean Water Act. The jury was then told that any person in charge of a vessel was required to report to the appropriate agency of the government "any discharge of oil . . . from such vessel . . . in violation of paragraph (3)." The Court then instructed the jury that paragraph 3 of the Clean Water Act prohibits the discharge of a "harmful quantity of oil" and that a "harmful quantity of oil is a quantity that causes a sheen on the water." Hence, the Clean Water Act requires a captain to immediately report the discharge of any oil which creates a sheen on the water.

In explaining the elements the Government was required to prove beyond a reasonable doubt, the Court instructed:

> ONE: That on or about March 26, 1995, in the District of the Virgin Islands, the defendant, Hubert Fredericks, was in charge of a vessel;

> TWO: That the defendant had knowledge of a discharge of a reportable quantity of oil from the vessel; and,

374

THREE: That the defendant failed to notify immediately the appropriate agency of the United States Government of the oil discharge as soon as he had knowledge of it.

(Jury Instructions at 22 (emphasis added).)

The meaning of "reportable quantity" was thus adequately explained to the jury.

■ Finally, counsel argues that he was not given a copy of the instructions in sufficient time to lodge objections before the Court read them to the jury. The record will reflect that the Court gave a proposed set of instructions to both counsel at the close of testimony. The Court requested that counsel make handwritten corrections and discussed at length the various instructions. The Court then allowed the instructions to age overnight before instructing the jury the next day. Counsel thus had more than enough opportunity to object to any instructions which he found disagreeable, and defense counsel did raise several objections which the Court addressed. For example, the Court incorporated some of the defendant's language in the definition of "immediately" and the Court disagreed with defendant's instruction on good character. Defendant had ample time to bring any problem with the Court's instruction on "reportable quantity of oil," but failed to do so.

## Direct Examination

■ Varlack Ventures ["Varlack"], the owner and operator of the ferry service for which Hubert Fredericks worked as a captain, was indicted as a co-defendant along with Fredericks. Upon the motion of both Varlack and Fredericks, the Court granted a severance. Both defendants were named in the first two counts, while Varlack was the only defendant in Count III of the indictment. Varlack's counsel, Alan D. Smith, assisted Frederick's counsel during jury selection and sat with defense counsel during the trial. During the defense case, Attorney Smith rose to present the testimony of a defense witness. The Government objected, arguing that if Smith were now to become an active participant in the trial only during the defense case, despite the severance, the Government wished to

375

be able to comment on it during closing arguments. It was clear to the Court that Fredericks had coordinated his defense with that of the corporation, although counsel for Varlack had merely assisted passively at counsel table during the prosecution's case in chief. The Court agreed with Government counsel that it would be permissible for the prosecutor to comment on the joint effort if Attorney Smith now played an active role during the defense case. In response, Fredericks, his attorney, and Varlack's attorney (Smith) decided not to have Smith conduct the examination. In short, the Court did not bar corporate counsel from presenting the witness; it merely agreed that the Government would be allowed to note that Varlack's counsel had taken an active role in its employee's defense. Fredericks cannot now complain about this tactical decision not to have corporate counsel present the witness.

## CONCLUSION

For all of the foregoing reasons, the motion for judgment of acquittal and, in the alternative, for new trial will be denied.